# EXHIBIT 3

**NANCY V. POWELL**
N.V.POWELL, A PROFESSIONAL CORP.

310 BRYANT STREET
PALO ALTO, CALIFORNIA 94301
PHONE: (650) 324-2526
FAX:     (650) 851-2943

February 8, 2012

Gary Strutz
Storek, Carlson & Strutz
100 View Street  #208
Mountain View, CA  94041

re: George Fiegl – Theft loss on Van Buren Estates loan

Dear Gary,

I am delivering to you with this letter a copy of a letter addressed to our mutual client, George Fiegl. With the letter is a memorandum prepared by me regarding Mr. Fiegl's investment in a promissory note secured by real property owned by Van Buren Estates, LP. This loan is now in default and it does not appear that there is any chance of George being paid off on it.

The main reason he will never be paid is that the loan was a sham from the start. There was insufficient security to assure repayment to him back when he made the loan in March 2008 and the value of the land has gone down since then.

George was given false information to lead him to believe that this loan was a viable investment. In addition, important information was withheld from him which would have indicated to him that there was insufficient equity in the property to support his loan.

I have prepared the enclosed Memo to put in one place the different facts and factors which lead to the conclusion that George was the victim of theft under California laws. As you can see from the attached, the facts and evidence are complicated. In my experience, as a former Deputy District Attorney, I doubt that the DA's office would consider filing theft charges – purely because of the complexity. The fact that the DA would probably decline to act does not make the theft any less a theft. Tom Lodato, Hank Skade and Reimer Stukenbroch stole George's money as clearly as if they robbed him.

I look forward to talking to see what I can contribute in addition to the enclosed that would help show the simple fact that George was the victim of a theft.

Sincerely,

Nancy V. Powell

cc: GF

D.FIEGL-000639

**NANCY V. POWELL**
N.V.POWELL, A PROFESSIONAL CORP.

**310 BRYANT STREET**
**PALO ALTO, CALIFORNIA 94301**
PHONE: (650) 324-2526
FAX: (650) 851-2943

February 8, 2012

George Fiegl

███████████████

re: Loan transaction/ Van Buren Estates ($10.M)
      Theft Opinion

Dear Mr. Fiegl;

I want to report to you my findings and my opinion in connection with my review of the facts and the law regarding your loan to Van Buren Estates, LP. I am relying on my over 35 years practicing law in California and my years as a Deputy District Attorney (DDA) in Santa Clara County, California. In my capacity as a DDA I made decisions regularly regarding whether there was sufficient evidence to file criminal charges against an individual or entity. I am familiar with the standard required for filing criminal charges and the limitations imposed by budget and manpower constraints in that regard. Since leaving the District Attorney's Office, I have represented many defendants and have seen the process from that side in addition to representing victims, such as you.

It is my opinion that you were the victim of a planned scheme to defraud you of the money you believed to be a "loan" on real property in Riverside County, known as the Van Buren Estates Property (Property). That scheme was a complicated one which included the conspiracy of at least three individual defendants: Tom Lodato, Hank Shank and Christian Reimer Stukenbrock.  It is also my opinion that because the scheme is very complicated and because there are civil remedies available to you (ie suing the defendants) the District Attorney's Office would reject the case for prosecution by their office. This does not mean that you do not have a good criminal case against those defendants. It only means that in considering the amount of work the case would require, the expert witnesses who would be required to put on the case (regarding the title company procedures and value of the land) and the fact that this case does not fit the standard profile for a theft case, the District Attorney would choose to allocate their resources to quicker, simpler and easier cases. In addition, there is a strong emphasis on spending District Attorney resources pursuing perpetrators of crimes resulting in bodily injury like murder, manslaughter etc rather than on financial crimes.

I have attached a memorandum which I prepared to help lay out the nature of the theft by fraud perpetrated against you. As you can see there are many layers of the deceit. You were both lied to and had information withheld. If you had been told the truth and told all relevant information which was available to the Defendants, you wouldn't have made the loan because it would have been clear that there was insufficient value in the property to pay you back.

Please contact me if you have any questions regarding the above or the enclosed.

Sincerely,

Nancy V. Powell

## Memorandum

**Issue: Was George Fiegl the victim** of a theft loss in connection with the $10,000,000 loan he agreed to make to Van Buren Estates Partners, LP? Specifically, when George Fiegl advanced to Van Buren Estates Partners, LP the sum of $7,200,000 under the terms of this loan did he do so based on false statements and the deliberate withholding of information such that he was the victim of a theft? (See Exhibit 0 for loan document.)

**Answer: Yes,** George Fiegl (GF) was the victim of a theft orchestrated by Tom Lodato (Tom) & Hank Skade (Hank) and facilitated by Christian (aka Reimar) Stukenbrock (hereinafter Reimar) such that he has a loss of $7,200,000.

**Second Issue:** Is there a **likelihood of recovery** of the $7,200,000?

**Answer: NO ;** GF's security interest is as a second deed of trust behind a $10,450,000 Note/Deed of Trust on the subject real property (Property). That Property has a present value of approximately $2,460,000 – not enough to cover the first deed of trust. Further, as to the individual defendants, they do not appear to have assets in their own names. Every indication is that they are sophisticated at hiding their assets and that GF would not be likely to recover damages from any of them.

### FACTS

Tom & Hank bought desert land outside of Palm Springs in 2005 in the town of Thermal, CA. The land was undeveloped desert land (no water, sewer, utilities etc.) which was zoned agricultural. When they bought the land they paid $11,552,000 for two parcels totaling about 164 acres. They financed the Property with $11,600,000 of loans. (ie $48,000 more in loans than the purchase price) See Exhibit 1 for original Deed of Trusts.

> Note: As to Exhibits attached hereto, in many cases only the cover page is attached. In most cases the full documents are lengthy. To consolidate matters for purpose of this Memo the full document is not attached. If the reader of this Memo is interested in the full document, please request the same of Nancy V. Powell.

As evidenced by a Deed of Trust dated June 30, 2005 (recorded as instrument #0550575) Tom and Hank borrowed another $1,285,000 from AGI 59th Avenue, LLC. At this point in time there was $12,885,000 in loans against the Property.

By January 2006 Tom & Hank had an engineer working actively to prepare the Property to obtain Tentative Map approval for 301 lots, zoning change and water/sewer etc entitlements.

Memo from NVP re: VBE/Theft Issue                                    Page # 1

D.FIEGL-000641

In March 2006 they borrowed another $13,000,000 against the Property from ACM. (See Exhibit 2) That same day they borrowed $5,425,000 from Series AGI Van Buren of Appian Group Investors DE, LLC. (See Exhibit 3) Appian loans are through a business in the same building and maybe in the same office as Hank.

At this point in time – March 2006, the Property is encumbered with $31,310,000 in loans. The land is raw dirt, miles from sewer and water with no entitlements and zoned agricultural.

Even with all of the loans on the Property, the LLC borrows another sum (which we estimate was $2,175,000 based on other information but not based on land record data) from Series AGI Van Buren II (AGI II) recorded April 20, 2006.

In July 2006 Earth Systems Southwest updates their analysis of the land done in 2004 and states their conclusion is the same as it was in 2004. Their opinion is that the land is susceptible to liquefaction because of the high ground water table. (See Exhibit 4 for Report w/o Appendix)

In 2007 they formed a Limited Partnership where Tom and Hank through their LLCs acted as the General Partner of the Limited Partnership. The Partnership raised $10,300,000 from the limited partners by August 2007. In the Private Placement Memorandum issued by Tom & Hank for this Partnership, they state on page 2 that the total amount of the encumbrances on the Property equaled approximately $21 million dollars. This Memorandum is dated June 2007. (See Exhibit 5 for 2 cover pages of Private Placement Memorandum plus pages 1 &2.) At this time the total loans evidenced on the land records against the Property was at least $31million NOT $21 million. The Property was conveyed to the Limited Partnership by Tom and Hank's LLCs by Grant Deed recorded 12/1/07.

In October 2007, the Property was approved for a Tentative Map **subject** to working out water, sewer, easements etc. as applicable. That October, the engineer working for Tom & Hank, Richard Soltysiak, met with the Water District (CVWD) and learned that Tom & Hank had not been told in their Title Report about certain easement rights CVWD had over the Property and further he was advised that access and rights to water and sewer infrastructure were going to be significantly more expensive than what they had understood/assumed. The thinking at that time by the engineer acting for Tom & Hank was that it would cost an additional $8-10,000,000 for water & sewer and in addition, the easement issue might require a total redo of the Tentative Map application. (See Exhibit 6 Depo of Richard Soltysiak taken 11/28/11 pgs 51-58, 64,69)

In December 2007 George was approached by Reimar to make a loan secured as a 2nd

D.FIEGL-000642

Deed of Trust on the Property. Reimar represented that he had investigated the investment aspects of the loan and determined that it was a sound and good investment. Reimar presented GF with a Preliminary Title report (Stewart Title) which showed that the only loan on the Property was the $13M loan to ACM. (See Exhibit 7 for cover page of Stewart Title Preliminary Report dated December 10, 2007. The only loan shown is on page 8 of this Report at item #11 where the $13M owed to ACM is listed.) Further, Reimar showed GF an appraisal obtained by Tom & Hank which asserted that the value of the Property was $40M. (See Exhibit 8 for full appraisal as given to GF.)

In January 2008, Tom & Hank formed an investor group (an LLC referred to as VBE Lenders) to invest in the property. They raised $10,450,000 in that LLC which was comprised in part of members of the Partnership. (See Exhibit 9 for 2 cover pages of that Private Placement Memorandum.)

It was represented to GF that the only loan on the Property, the $13M loan to ACM, was to be repaid through the escrow which recorded his Deed of Trust and the new first Deed of Trust from Lenders in the amount of $10,450,000. Based on these and other representations, GF agreed to loan $10M to be secured by a 2nd Deed of Trust on the Property.

As part of the deal with GF, it was represented to GF that any excess proceeds from the two loans after payment of the $13M loan and past due taxes would go to the Partnership to be used to further the progress toward getting a Final Map on the Property. (See Exhibit 10 Fidelity Title Co Lender's Escrow Instructions dated March 10, 2008 initialed and signed by GF on March 18, 2008 wherein it is stated on page 2 that over $4M would go to Borrower as an estimated refund.)

GF was never told that there were easements that had just been learned about on the Property and that these easements might require a re-do of the Tentative map. He was never told that a damages claim of over $500,000 would be asserted against Stewart Title for damages resulting from the failure to inform them of the easements. (See Riverside County Superior Court, Indio Division records for case #INC 10002614) He was never told that the water and sewer rights were going to be harder to get and more expensive than what had ever been anticipated. He was misled to believe the $40M appraisal he was given represented a fair professional assessment of the value of the Property in December 2007.

GF was deliberately misled by the appraisal showing the Property valued at $40M dated December 14, 2007. (Exhibit 8) The appraisal in its format was misleading and led GF to believe

Memo from NVP re: VBE/Theft Issue                                    Page # 3

that the Property had a current value of $40 million. The appraisal in fact was based on "extraordinary assumptions, hypothetical conditions" etc which among other things assumed that Final Map approval had been granted for the Property. The truth was that the Property was a long ways from Final Map approval. It did not have the water or sewer rights worked out nor did it have the zoning change from agricultural to residential. In fact, as of January 2012, the Property still does not have Final Map approval. In other words the appraisal was a total fantasy.

GF and the Lender group deposited their money into escrow (Fidelity Title Co.) GF's payment into escrow was $7.2 million. Lender group was to make a loan of $10,450,000. In fact almost $4 million shows on the Final Closing Statement as being paid to Lender as some sort of loan charge. (See Exhibit 10b.) The Estimated Closing Statement signed off by GF only 3 days before escrow closing (Exhibit 10a) did not show this "loan charge". It showed the money being available to the Partners for use in developing the Property. (Exhibit 10a)

With the discrepancies in the escrow statements, an examination is next made of the land records. There were three loans on the Property that were reconveyed within one day of receipt of GF's money. The original loan in the amount of $6.4million (See Exhibit 11), the second original loan in the amount of $5.2 million (See Exhibit 12) and the AGI 59th Ave loan in the amount of $1,285,000 (See Exhibit 13) were all reconveyed. These loans were not shown as being on the Property in documents provided to GF before he agreed to make his loan and nowhere in the escrow instructions did he agreed these were to be paid from the money he loaned.

The ACM $13million loan was reconveyed outside of escrow months later – on May 5, 2008. (See Exhibit 14)

December 1, 2008 an Application for Changed Assessment was filed with the County of Riverside requesting a reduction in the assessed value for County real estate tax purposes. The application (approved by Hank) asserted that the market value of all of the lots combined was $7,374,150 as of January 1, 2008 (in other words before they took out over $20,000,000 of new loans in March 2008). (See Exhibit 15 for a list of the asserted value of the 5 parcels, the 5 applications plus the power of attorney form completed by Hank for each of the 5 parcels.)

GF asked for an update on the status of the Property development in November 2009. To that end, a meeting was held at the Property where Tom and Hank assured GF that the Property continued to support his loan. In order to perpetuate their fraud on GF, they obtained an appraisal dated December 1, 2009 which showed that the appraised value of the Property was still

D.FIEGL-000644

$16,300,000. (See Exhibit 16.) This appraisal continues the fraud on GF because whereas that appraisal says the Property was worth $16,300,000 and states that it is an "as is market value", if you look at the fine print, that appraisal assumes certain hypothetical things such as the Property having a Final Map and Avenue 59 not going thru the Property. Tom caused this appraisal to be delivered to GF and did not inform him (1) that he personally believed the Property was only worth 2/3s of that amount (See Exhibit 17:Tom's depo pg 60 in Property owner's litigation against Stewart Title) and (2) there was no basis for assuming Ave 59 would not go thru the Property even though Tom had just on October 12, 2009 sent his investors a Project Update saying that there was no basis for saying Ave 59 would not go thru the Property.

The VBE Lender loan and GF's loan both came due in March 2010. At that time GF learned that his loan would not be paid off as scheduled and that Tom and Hank believed the Property was worth significantly less than the encumbrances on it. With the loan in default, GF sought and obtained an appraisal of the Property from Warren & Associates. That appraisal shows that the Property was worth only $2,460,000 in an "as is" condition on June 10, 2010 and only worth $6,555,000 in December 2007 – a far cry from the $40,000,000 claimed by Tom & Hank.

<div align="center">LAW</div>

Theft Losses may be taken to the extent of the loss when the amount of the loss can be proven, when the nature of the taking is a crime under the laws of the State of California and when there is no prospect of recovery. First, a look at California law:

THEFT GENERALLY (PENAL CODE 484)

One relevant California code section under which a theft will be found is Penal Code Section 484. The portion of that code as it relates to GF is that: Every person who takes personal property from another by false or fraudulent representation or pretense or defrauds any other person of money or who causes or procures others to report falsely of his or her wealth and by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains possession of money …, is guilty of theft. (See Exhibit 18 for precise code language.)

THEFT BY FALSE PRETENSE (PENAL CODE 532(a))

Another California Code section under which a theft may be charged is Penal Code Section 532(a). Under this code section, if a person makes a false statement in writing with the intent that it be relied on respecting the financial condition or means or ability to pay for the purpose of procuring money, and the person knows that a false statement has been made, that

Memo from NVP re: VBE/Theft Issue                                    Page # 5

D.FIEGL-000645

person is guilty of a public offense. (See Exhibit 18 for the full text of the above Code Sections.)

## APPLICATION OF LAW TO FACTS

**MISREPRESENTATIONS:**

**1. Cash into Property:** Tom & Hank represented to GF that they had put $700,000 into the purchase of the Property. (See Exhibit 5) In fact, GF now knows from the loans on the Property that they obtained loans in excess of the purchase price of the Property. (See Exhibit 1)

**Effect of Misrepresentation:** GF was falsely led to believe that Tom & Hank had a stake in the Property which would lead him to have a greater degree of confidence in their proceeding with the development.

**2. Loans on Property:** Tom & Hank represented to GF that there was one loan in the face amount of $13,000,000 on the Property when he was considering making his loan. They further represented that that loan would be paid off with his money and the money form VBE Lenders. In support of this fact they supplied GF with a Preliminary Title Policy issued by Stewart Title (Exhibit 7) dated December 10, 2007. That policy only showed the $13,000,000 owing to ACM as a lender encumbrance. In fact, a review of the land records shows that there were at least 4 loans on the Property at that time. The $13M one they acknowledge (Exhibit 2), the original 2 loans for $6,400,000 and $5,200,000 (Exhibit 1) and the loan to AGI 59th Avenue in the amount of $1,285,000. This puts the total loans owed on the Property at $25,885,000, $12,885,000 more than GF was told or agreed to. And this does not include the limited partners who put in $11.3 million as an investment.

**Effect of Misrepresentation:** GF was falsely led to believe by writings supplied by Tom &/or Hank that there were fewer encumbrances on the Property than what there were. GF was already agreeing to be a second loan behind a $10.45million loan. He would not have agreed to be a fourth loan behind these additional moneys owed.

**3. Proceeds of Loan thru Escrow:** Tom & Hank worked with Fidelity Title Company in doing the paperwork, funds transmittal and recording of documents relating to GF's loan. Tom & Hank selected Fidelity Title and were the primary persons to communicate with Fidelity. GF was given an Estimated Closing Statement dated March 10, 2008. He initialed and signed his approval of the cash flow as shown on that Statement on March 18, 2008. That Statement showed that after payment of the outstanding loan and real estate taxes that there would be approximately $4M that would go to the benefit of Borrower (ie the LP) which GF could reasonably presume would be used for the furtherance of the development of the Property. In fact, now that GF has obtained

Memo from NVP re: VBE/Theft Issue                                    Page # 6

D.FIEGL-000646

and reviewed the Borrower Final Closing Statement, he now knows that the $4M went back to VBE Lenders as some type of "loan charge" and was not used to further the development of the Property.

**Effect of Misrepresentation:** GF took a 2nd position as a lender on Property that started out as desert land zoned for agricultural use. The Property needed to have many different entitlements such as sewer, water, zoning, lot line approval etc. before it could be developed as was planned. He did not know the extent of the problems and expense anticipated on the Property but he knew that there were serious financial costs to obtaining a Final Map and relied on the extra $4Million dollars going to further the goal of getting Final Map approval. His security in the Property was significantly impaired by the diversion of funds to VBE Lenders without his consent or knowledge, especially because he specifically signed his approval of the handling of funds thru Fidelity Title Company only 3 days before the loans closed escrow.

## DECEPTIVE WITHHOLDING OF INFORMATION:

**4. Status of "entitlements":** GF was not told that only months before he was approached to lend money secured on the Property that Tom & Hank had been told that the water and sewer costs and options were very different and would be much more expensive than what had been anticipated. The plans to that point had anticipated connecting the sewer to a system that had been proposed. In October 2007, Tom & Hank learned from their engineer, Richard Soltysiak that they were going to have to do a very extensive restructuring of their sewer plan at significant additional cost. The estimate by their engineer at that time was that it would cost an additional $8-12 million dollars. They also at that same time learned that the access and rights to water would be much more expensive to get than what they had anticipated. (See Exhibit 6.)

**Effect of Misrepresentation:** GF did not have the opportunity to assess the true risk of his security in the Property because this information was withheld. If he had understood the scope of the additional costs and problems having to do with the water and sewer systems to be put on the Property he would have known that there would be no value in the Property over and above other encumbrances to secure his loan when all the expenses to obtain entitlements were paid.

**5. Soils tests showed Property was at risk for liquefaction:** As early as 2004 Tom & Hank had a soils test which showed that the Property had a high risk for liquefying based on the high water

D.FIEGL-000647

table. Tom & Hank sought to have the engineers revise that report in July 2006. (Exhibit 4) The result was that the engineers stood behind their earlier report. The nature and scope of the findings in this report were not disclosed to GF and his attention was falsely drawn to an appraisal that bore no resemblance to reality.

**Effect of Misrepresentation:** GF was misled into underestimating the costs to develop the Property to deal with the instability of the soil and further misled into underestimating how the soils condition might impact prospective sales of the Property and therefore his security in his loan.

**6. $4 million dollars going back to VBE Lenders:** GF was specifically advised and signed off on Escrow Instructions which stated that the LP was going to have $4 million dollars after borrowing from him and VBE Lenders. (Exhibit 10a) GF knew that the Property needed plans, drawings, studies and work in order to get a Final Map and have a more marketable property. When GF made his loan he knew the Property was raw dessert land. He may not have known that it was still zoned agricultural or that it had huge sewer and water hurdles to overcome, but he knew there would be expenses and he relied on the LP using the $4 million dollars in connection with their borrowing to further the Property development. Tom and Hank even as late as April 2010 still asserted in a memo to an attorney on GF's behalf that the $4 million went to the LP when the Final Closing documents show otherwise.

**Effect of Misrepresentation:** GF's security was impaired by the LP essentially giving $4 million dollars to an investor group comprised mostly of themselves. GF was misled and would not have made his investment if he had known that truth.

**7. True value of Property $6,550,000:** GF has had a retrospective appraisal done on the Property to determine the true and correct value of the Property back in December 2007. That appraisal dated 6/10/2010 was done by Warren & Associates, Inc. It is their professional opinion that the Property, in an as is condition, was worth $6,555,000 in December 2007. It is noteworthy that the Partners submitted applications to the County asserting that the market value of the Property was $7,374,150 as of 1/1/2008 (submitted on 12/1/08) (See Exhibit 15.)

**Effect of Misrepresentation:** If GF had known the true value of the Property he would never have considered loaning money to be secured on it. Not as a first Deed of Trust and certainly not as a second behind over $10 million.

Memo from NVP re: VBE/Theft Issue                                Page # 8

D.FIEGL-000648

**8. Reimar was paid $250,000 to set up GF to lend on Property:** GF now knows that Reimar was paid $250,000 by Tom & Hank to get GF to loan on the Property. This financial incentive would make it difficult to diligently and realistically evaluate the nature of the investment he was recommending GF make. This information was withheld from GF until long after the loan was made.

      **Effect of Misrepresentation:** If GF had known the amount of the payment made to Reimar and therefore the incentive he had to get GF to make the loan, he would have at least known that he needed to have some impartial due diligence done on his own and he would not have relied as he did on the opinion and recommendation of Reimar. An impartial person evaluating GF's investment risk would have concluded GF should not invest in this loan. In addition, if GF had known that Reimar had a Judgment against him for securities violations he would have known not to be as trusting of Reimar's recommendations.

**9. Undisclosed Easements; complaint filed for $632,000 damages:** In January 2008 Tom & Hank were wooing GF to loan to them with statements and documents to the effect that the Property had significant value over and above the loans which would be secured on the Property and indications that all was going well in proceeding with the County representatives toward the end of getting approval of the Final Map. They failed to disclose to him that they had just in October 2007 learned that there were 2 easements on the Property in favor of the CVWD that would require a restructuring of their plans to date or a significant work around with the CVWD. They filed a claim against Stewart Title Company in early 2008 and assert that they were damaged. Their complaint for damages filed in the Riverside County Superior Court claims they were damaged in the sum of $632,000. In fact they have a partial settlement in that case which netted them $880,000. Yet, they did not disclose the easement issue to GF prior to his loan and the first time GF heard of the claim against Stewart Title was when he was copied on the Project Status Report dated February 15, 2011 which Report was sent out by Tom.

**Effect of Misrepresentation:** GF would have taken into consideration a problem such as the CVWD easements that were of nearly a million dollar magnitude in making his investment decision. This factor may have resulted in him deciding not to make his loan and certainly in connection with all of the other misrepresentations and failures to disclose, he would not have made the loan.

Memo from NVP re: VBE/Theft Issue                                        **Page # 9**

D.FIEGL-000649

**10. Appraisal in December 2009 was used to continue to mislead GF:** Tom ordered another appraisal in December 2009 after his meeting with GF at the Property where GF questioned the value of the Property. (Exhibit 16) That December 2009 Appraisal said the Property was worth $16,300,000. That appraisal was based on assumptions Tom knew to be incorrect. For example, in a separate statement to the limited partners, Tom on October 12, 2009 communicated that there was no basis for saying Avenue 59 would not go thru the Property and then permitted the appraisal to make precisely that assumption as if it was fact.

**Effect of Misrepresentation:** GF was led to believe that there was still a possibility that there was value to support his loan and to not take action. When GF did have his own appraisal done without hypothetical assumptions that were not grounded in reality the value of the Property as of December 2007 was fixed at $2,460,000 and not the $40 million asserted to him by Tom & Hank. (Exhibit 19) This later, 2009, false valuation was just another attempt to keep GF in the dark so that he would not look further into all of their assertions and the true facts relating to the Property.

## Misc. additional factors:

**11. Reimar had a prior conviction for securities fraud:** Reimar had a complaint filed against him in 1998 by the State of Idaho wherein it was alleged that Reimar offered securities for sale to investors and Reimar knew or should have known that these investments or programs did not exist or they could not trade them in the manner that had been represented to investors. The complaint further alleges that Reimar made untrue statements of material fact and misleading statements regarding investment return and the risk of the investment. Judgment was taken against Reimar in April 1999. That Judgment found in favor of the State on all issues and ordered payment of damages by Reimar and a ordered that a  Permanent Restraining Order issue preventing Reimar from doing securities business in Idaho. GF did not know that there was a 1999 Judgment against Reimar for securities violations and that he was permanently enjoined from many securities activities in the State of Idaho based on his conduct there. (See Exhibit 20 for the Complaint, Judgment and News Release.)

**Effect of failure to advise GF regarding prior conviction for fraud:** GF did not know that he was dealing with a known and prosecuted crook. If Reimar had been forthcoming about his

D.FIEGL-000650

previous business issues and if he had complied with California laws and the Judgment against him requiring that he make true statements and not attempt to mislead investors, then GF would have learned the true facts and he would not have made the loan that is at issue.

## SUMMARY

No one factor above would be sufficient to sustain a finding that GF has been defrauded and deceived by Tom and Hank with the assistance of Reimar but when all of these factors are considered together there is the unmistakable conclusion that GF had $7.2 million dollars taken from him as clearly as if they slipped it out of his pocket without his knowing it. They adroitly used smoke and mirrors to make the Property look like something it wasn't. They lied about the status of the Property both from the standpoint of what encumbrances were of record and what hurdles needed to be overcome to be able to develop the Property. All of this was done with the clear purpose and intent of conning GF into parting with $7.2 million dollars all the while they knew there would be no likelihood of him recovering these funds.

Most certainly Tom, Hank & Reimar knowingly made false and fraudulent representations in order to defraud GF of his money. By doing so, they committed theft under Penal Code Section 484. Since some of the false statements were in writing and clearly with the intent that the writings be relied on, they are also guilty of theft under Penal Code Section 532(a).

Dated: _2/8/12_

By: Nancy V. Powell, Esq.

D.FIEGL-000651

INDEX TO EXHIBITS

| | |
|---|---|
| PROMISSORY NOTE TO GEORGE FIEGL | EXHIBIT 0 |
| ORIGINAL LOANS for $6.4M and $5.2M | EXHIBIT 1 |
| ACM LOAN for $13M | EXHIBIT 2 |
| SERIES AGI Van Buren of Appian Group Investors loan $5.425M | EXHIBIT 3 |
| EARTH SYSTEMS SOUTHWEST Soil/Liquefaction  Report | EXHIBIT 4 |
| PRIVATE PLACEMENT MEMORANDUM VBE LIMITED PARTNERS | EXHIBIT 5 |
| Depo Richard Soltysiak, engineer for Tom & Hank (11/28/11) | EXHIBIT 6 |
| STEWART TITLE PRELIMINARY REPORT   (Dec 2007) | EXHIBIT 7 |
| DOZIER'S $40M APPRAISAL 12/14/07 | EXHIBIT 8 |
| PRIVATE PLACEMENT MEMORANDUM VBE LENDERS, LLC | EXHIBIT 9 |
| FIDELITY TITLE ESTIMATED CLOSING STATEMENT 3/10/08 | EXHIBIT 10A |
| FIDELITY TITLE FINAL CLOSING STMT 3/21/08 | EXHIBIT 10B |
| RECONVEYANCE HARBORD LOAN $6.4M | EXHIBIT 11 |
| RECONVEYANCE APPIAN MEZZ LOAN $5.2M | EXHIBIT 12 |
| RECONVEYANCE AGI 59th AVE LOAN $1.285M | EXHIBIT 13 |
| RECONVEYANCE ACM LOAN $13M | EXHIBIT 14 |
| APPLICATION FOR CHANGED ASSESSMENT | EXHIBIT 15 |
| DOZIER'S $16.3M APPRAISAL 12/1/09 | EXHIBIT 16 |
| DEPO TOM LODATO taken 5/17/11 in Stewart Title litigation | EXHIBIT 17 |
| PENAL CODE SECTIONS 484 and 532a | EXHIBIT 18 |
| WARREN & ASSOCIATES APPRAISAL done JULY 2010 | EXHIBIT 19 |
| COMPLAINT/JUDGEMENT/NEWS RELEASE - REIMAR | EXHIBIT 20 |

**PROMISSORY NOTE TO GEORGE FIEGL**

**EXHIBIT 0**

D.FIEGL-000653

*copy via Fidelity*

# PROMISSORY NOTE SECURED BY DEED OF TRUST

$ 10,000,000                                                                                   March 20, 2008

FOR VALUE RECEIVED, the undersigned Van Buren Estates Partners, LP, a California limited partnership with its principal offices at C/O Thomas Lodato, 846 Portola Road, Suite J, Portola Valley, California 94028 ("Maker"), promises to pay to the order of George Fiegl, whose address is: 401 National Ave., Mountain View, CA 94043  ("Payee"), the principal sum of TEN MILLION DOLLARS ($10,000,000) together with interest at the rate set forth below.

Any capitalized term used and not otherwise defined in this Promissory Note Secured By Deed of Trust (the "Note") shall have the meaning given to it in the Second Deed Of Trust, dated as of the date hereof among the Maker, Payee and Stewart Title of California, as Trustee (the "Deed of Trust").

It is acknowledged that: (1) the Deed of Trust encumbers certain raw land located near the city of La Quinta, county of Riverside, state of California and more particularly described in Exhibit A attached hereto and incorporated herein (the "Property"); and (2) the Deed of Trust is subject to the rights of all prior lien holders, including a Deed of Trust of Van Buren Estates Lenders, LLC.

Maker further promises to pay to the order of Payee interest on the principal balance of this Note outstanding at the rate of fourteen percent (14%) per annum, accruing from the date hereof. All computations of interest shall be made by Payee on the basis of a year of 365 days for the actual number of days occurring in the period for which such interest is payable.

The parties agree that, contemporaneously with the execution of this Note: (a) Maker shall receive from Payee SEVEN MILLION TWO HUNDRED THOUSAND DOLLARS ($7,200,000) as loan proceeds and (b) Payee shall withhold TWO MILLION EIGHT HUNDRED THOUSAND DOLLARS ($2,800,000) of the remaining principal ("Interest Reserve") as interest reserve for the purpose of paying accrued interest under this Note.  Funds withheld in the Interest Reserve shall be deemed earned interest ("Earned Interest") by Payee as accrued on a daily basis under the terms of this Note.   The amount of any remaining funds withheld as Interest Reserve that are not deemed Earned Interest pursuant to the last sentence shall be deemed unearned as interest ("Unearned Interest")

The principal and any unpaid Earned Interest under this Note shall be payable in full at maturity. The final maturity of this Note shall be March 20, 2010, and all amounts due and payable hereunder shall be due and payable in full on such date.  Payments under this Note shall be in immediately available funds paid in U.S. Dollars.

This Note may be prepaid in full at any time, provided, however, that (a) upon prepayment before March 20, 2009, Maker shall pay to Payee the principal, less the amount of any Unearned Interest that would have existed if this Note had remained outstanding and continued to accrue interest through and including March 20, 2009; and (b) upon prepayment after March 20, 2009,

George Fiegl PNote                                    Page 1 of 5

D.FIEGL-000654

**ORIGINAL LOANS for $6.4M and $5.2M**                    **EXHIBIT 1**

D.FIEGL-000655

DOC # 2005-0198823
03/11/2005 08:00A Fee:145.00
Page 1 of 35
Recorded in Official Records
County of Riverside
Larry W. Ward
Assessor, County Clerk & Recorder

STEWART TITLE–Riverside

RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:

John D. Fredericks, Esq.
Winston & Strawn, LLP
101 California Street, 39th Floor
San Francisco, CA 94111

| M | S | U | PAGE | SIZE | DA | PCOR | NOCOR | SMF | MISC. |
|---|---|---|---|---|---|---|---|---|---|
| ✓ | 3 | A | 35 | | 1 | | | | |
| A | R | L | | | | COPY | LONG | REFUND | NCHG | EXAM |

(Space Above This Line For Recorder's Use Only)

145-



## DEED OF TRUST, SECURITY AGREEMENT WITH ASSIGNMENT OF RENTS AND FIXTURE FILING

This DEED OF TRUST, SECURITY AGREEMENT WITH ASSIGNMENT OF RENTS AND FIXTURE FILING (this "Deed of Trust") is being executed as of this _8th_ day of March, 2005, by VAN BUREN ESTATES, LLC, a California limited liability company ("Grantor"), to STEWART TITLE OF CALIFORNIA, INC., ("Trustee") in favor of HARBORD FINANCE, LLC, a California limited liability company ("Beneficiary").

### WITNESSETH:

WHEREAS, Beneficiary has made a loan to Grantor in the amount of **Six Million Four Hundred Thousand Dollars ($6,400,000)** (the "Loan");

WHEREAS, this Deed of Trust secures:  (1) the full and punctual payment of the indebtedness evidenced by that certain promissory note dated of even date herewith (the "Note"), the final payment of which is due no later than September 30, 2006 (the "Maturity Date"), made by Grantor to the order of Beneficiary in the original principal face amount of **Six Million Four Hundred Thousand Dollars ($6,400,000)** with interest thereon at the rate therein provided, together with any and all renewals, modifications, consolidations, and extensions of the indebtedness evidenced by the Note, any and all additional advances made by Beneficiary to protect or preserve the Property (as hereinafter defined), any and all future advances as may be made by Beneficiary and any other amounts required to be paid by Grantor under any of the Loan Documents (as hereinafter defined), such indebtedness, advances, and amounts being hereinafter collectively referred to as the "Secured Indebtedness;" and (2) the full performance by Grantor of all of the provisions, agreements, covenants, and obligations contained herein or in any of the other Loan Documents. The Note, this Deed of Trust and any and all other documents evidencing, securing or relating to the indebtedness secured by this Deed of Trust (but excluding that certain Unsecured Indemnity Agreement executed by Grantor of even date herewith) and all renewals, modifications, consolidations, and extensions of such documents are herein collectively referred to as the "Loan Documents".

NOW, THEREFORE, IN CONSIDERATION of the Loan of **Six Million Four Hundred Thousand Dollars ($6,400,000)** in hand paid, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and in order to secure the Secured Indebtedness and other obligations of Grantor set forth in this Deed of Trust and the other Loan Documents, Grantor does hereby irrevocably bargain, sell, transfer, grant, convey, assign, and warrant to:

D.FIEGL-000656

STEWART TITLE-Riverside

DOC # 2005-0198825
03/11/2005 08:00A Fee:154.00
Page 1 of 38
Recorded in Official Records
County of Riverside
Larry W. Ward
Assessor, County Clerk & Recorder



RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:

John D. Fredericks, Esq.
Winston & Strawn, LLP
101 California Street, 39th Floor
San Francisco, CA 94111

| M | S | U | PAGE | SIZE | DA | PCOR | NOCOR | SMF | MISC. |
|---|---|---|------|------|----|----|-------|-----|-------|
|   |   |   |      |      |    |    |       |     |       |
| A | R | L |      |      |    | COPY | LONG | REFUND | NCHG | EXAM |

(Space Above This Line For Recorder's Use Only)

## DEED OF TRUST, SECURITY AGREEMENT WITH ASSIGNMENT OF RENTS AND FIXTURE FILING

This DEED OF TRUST, SECURITY AGREEMENT WITH ASSIGNMENT OF RENTS AND FIXTURE FILING (this "Deed of Trust") is being executed as of this ___8TH___ day of March, 2005, by VAN BUREN ESTATES, LLC, a California limited liability company ("Grantor"), to STEWART TITLE OF CALIFORNIA, INC., ("Trustee") in favor of APPIAN MEZZ, LLC, a California limited liability company ("Beneficiary").

### WITNESSETH

WHEREAS, Beneficiary has made a loan to Grantor in the amount of **Five Million Two Hundred Thousand Dollars ($5,200,000)** (the "Loan");

WHEREAS, HARBORD FINANCE, LLC ("Senior Lender") has made a loan to Grantor in the original principal amount of Six Million Four Hundred Thousand Dollars ($6,400,000), which loan is secured, by among other things, a lien (the "Senior Deed of Trust") on the Property senior to this Deed of Trust (the Senior Deed of Trust, together with all other documents evidencing, securing or relating to the indebtedness secured by the Senior Deed of Trust, collectively, the "Senior Loan Documents"); and

WHEREAS, this Deed of Trust secures: (1) the full and punctual payment of the indebtedness evidenced by that certain promissory note dated of even date herewith (the "Note"), the final payment of which is due no later than September 30, 2006 (the "Maturity Date"), made by Grantor to the order of Beneficiary in the original principal face amount of **Five Million Two Hundred Thousand Dollars ($5,200,000)** with interest thereon at the rate therein provided, together with any and all renewals, modifications, consolidations, and extensions of the indebtedness evidenced by the Note, any and all additional advances made by Beneficiary to protect or preserve the Property (as hereinafter defined), any and all future advances as may be made by Beneficiary and any other amounts required to be paid by Grantor under any of the Loan Documents (as hereinafter defined), such indebtedness, advances, and amounts being hereinafter collectively referred to as the "Secured Indebtedness;" and (2) the full

D.FIEGL-000657

**ACM LOAN for $13M**

**EXHIBIT 2**

D.FIEGL-000658

STEWART TITLE-Riverside

DOC # 2006-0164611
03/08/2006 08:00A Fee:31.00
Page 1 of 6
Recorded in Official Records
County of Riverside
Larry W. Ward
Assessor, County Clerk & Recorder

Recording Requested By:

When Recorded Mail To:

ACM INVESTOR SERVICES, INC.
17 E. Sir Francis Drake #200
Larkspur, CA 94939

| M | S | U | PAGE | SIZE | DA | PCOR | NOCOR | SMF | MISC. |
|---|---|---|------|------|-----|------|-------|-----|-------|
| √ | 2 | 6 |      |      | 1   |      |       |     | a c   |
| A | R | L |      |      |     | COPY | LONG  | REFUND | NCHG | EXAM |

Loan No.06190912

# DEED OF TRUST WITH ASSIGNMENT OF RENTS
### (This Deed of Trust contains an Acceleration Clause)



   This **DEED OF TRUST** made 02/09/2006, between: **VAN BUREN ESTATES, LLC**◆**VAN BUREN ESTATES II, A CALIFORNIA LIMITED LIABILITY COMPANY**, herein called **TRUSTOR(S)**, whose address is: **TIBURON VENTURES/THOMAS LODATO LARKSPUR, CA 94939** and **ACM INVESTOR SERVICES, INC.** herein called **TRUSTEE**, and **ACM INVESTOR SERVICES, INC.** , herein called **BENEFICIARY**;
   **WITNESSETH:** The Trustor irrevocably **GRANTS, TRANSFERS AND ASSIGNS TO TRUSTEE** in trust, with **POWER OF SALE**, that property in the State of California, in the City of **THERMAL, CA 92274**, County of **RIVERSIDE**, described as:
   **59TH AVENUE, RIVERSIDE, CA APN 759-080-011-3, SEE EXHIBIT "A", LEGAL DESCRIPTION** attached.
   Together with the rents, issues and profits thereof, together with all rights and interest of Trustor, to all appurtenances, easements, community interests and licenses, and to oil, mineral, gas, water, water certificates, and hydrocarbon rights, leases, and overriding royalties therein, and all of these, whether appurtenant, riparian or appropriative. **SUBJECT, HOWEVER,** to the right, power and authority given to and conferred upon Beneficiary by paragraph 11 of the provisions incorporated by reference herein, to collect and apply such rents, issues and profits.
FOR THE PURPOSE OF SECURING:
(1) Performance of each agreement of Trustor incorporated by reference or contained herein;
(2) Payment of the indebtedness evidenced by one promissory note of even date herewith any amounts that may become due thereunder, and all extensions, modifications, or renewals thereof, in the principal sum of **$13,000,000.00** executed by Trustor and payable to Beneficiary or order;
(3) Payment of all sums of money, with interest thereon, which may be paid out or advanced by or may otherwise be due to Trustee or Beneficiary under any provision of this Deed of Trust.
   In the event of sale or transfer, conveyance or alienation of said real property, or any part thereof, or any interest therein, whether voluntary or involuntary, Beneficiary shall have the right of acceleration, at its option, to declare the Note secured by the Deed of Trust, irrespective of the maturity date expressed therein, and without demand or notice, immediately due and payable.  No waiver of this right shall be effective unless it is in writing.  Consent by the Beneficiary to one such transaction shall not constitute waiver of the right to require such consent to succeeding transactions.
   To Protect the security of this Deed of Trust, and with respect to the property described above, Trustor expressly makes each of all of the agreements, and adopts and agrees to perform and be bound by each and all of the terms and provisions set forth as follows:
1.  To keep said property in good condition and repair; not to remove or demolish any building thereon; to complete or restore promptly and in good and workmanlike manner any building which may be constructed, damaged or destroyed thereon; to keep all buildings, structures and other improvements now or hereafter situated on the above described property at all times entirely free of dry rot, fungus, rust, decay, termites, beetles, and any other destructive insects or elements; to pay when due all claims for labor performed and materials furnished therefore; to comply with all laws affecting said property or requiring any alterations or improvements to be made thereon; not to commit or permit waste thereof; not to commit, suffer or permit any act upon said property in violation of law; to cultivate, irrigate, fertilize, fumigate, prune, and do all other acts which from the character or use of said property may be reasonably necessary, the specific enumerations herein not excluding the general. Either Beneficiary or Trustee, or both, at any time during the continuation of this Deed of Trust, may enter upon and inspect said property, provided such entry is reasonable as to time and manner.

Page 1 of 4

D.FIEGL-000659

SERIES AGI Van Buren of Appian Group Investors loan $5.425M          **EXHIBIT 3**

D.FIEGL-000660

STEWART TITLE—Riverside 

DOC # 2006-0164612
03/08/2006 08:00A Fee:150.00
Page 1 of 40
Recorded in Official Records
County of Riverside
Larry W. Ward
Assessor, County Clerk & Recorder

RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:

David G. Estes, Esq.
Law Offices of David G. Estes
88 Kearny Street, 4th Floor
San Francisco, CA 94108

| M | S | U | PAGE | SIZE | DA | PCOR | NOCOR | SMF | MISC. |
|---|---|---|------|------|----|----|-------|-----|-------|
| √ | 3 | N | 40 | | | | | | |
| A | R | L | | | COPY | LONG | REFUND | NCHG | EXAM |

(Space Above This Line For Recorder's Use Only)

## DEED OF TRUST, SECURITY AGREEMENT WITH ASSIGNMENT OF RENTS AND FIXTURE FILING



This DEED OF TRUST, SECURITY AGREEMENT WITH ASSIGNMENT OF RENTS AND FIXTURE FILING (this "Deed of Trust") is being executed as of this 2 day of March, 2006, by VAN BUREN ESTATES, L.L.C., a California limited liability company ("Grantor"), to STEWART TITLE OF CALIFORNIA, INC., ("Trustee") in favor of SERIES AGI VAN BUREN OF APPIAN GROUP INVESTORS DE, LLC, a Delaware series limited liability company ("Beneficiary").

### WITNESSETH:

WHEREAS, Beneficiary has made a loan to Grantor and Van Buren Estates II, L.L.C., a California limited liability company (collectively, "Borrower") in the amount of Five Million Four Hundred Twenty-Five Thousand Dollars ($5,425,000) (the "Loan");

WHEREAS, ACM Investor Services, Inc. ("Senior Lender") has made a loan to Grantor in the original principal amount of Thirteen Million Dollars ($13,000,000), which loan is secured, by among other things, a lien (the "Senior Deed of Trust") on the Property senior to this Deed of Trust (the Senior Deed of Trust, together with all other documents evidencing, securing or relating to the indebtedness secured by the Senior Deed of Trust, collectively, the "Senior Loan Documents"); and

WHEREAS, this Deed of Trust secures: (1) the full and punctual payment of the indebtedness evidenced by that certain promissory note dated of even date herewith (the "Note"), the final payment of which is due no later than March 31, 2007, as may be extended (the "Maturity Date"), made by Borrower to the order of Beneficiary in the original principal face amount of Five Million Four Hundred Twenty-Five Thousand Dollars ($5,425,000), with interest thereon at the rate therein provided, together with any and all renewals, modifications, consolidations, and extensions of the indebtedness evidenced by the Note, any and all additional advances made by Beneficiary to protect or preserve the Property (as hereinafter defined), any and all future advances as may be made by Beneficiary and any other amounts required to be paid by Grantor under any of the Loan Documents (as hereinafter defined), such indebtedness, advances, and amounts being hereinafter collectively referred to as the

C:\Documents and Settings\barbara\Local Settings\Temporary Internet Files\OLK26\Deed of Trust - Junior VB redlined 022706.doc

1

D.FIEGL-000661

**EARTH SYSTEMS SOUTHWEST Soil/Liquefaction Report**                    **EXHIBIT 4**

D.FIEGL-000662

VAN BUREN ESTATES, LLC
750 MENLO AVENUE, SUITE 250
MENLO PARK, CALIFORNIA 94025

**REPORT OF**
**PRELIMINARY GROUNDWATER**
**AND LIQUEFACTION ASSESSMENT**
**PROPOSED RESIDENTIAL DEVELOPMENT**
**NORTHEAST CORNER OF**
**VAN BUREN STREET AND AVENUE 60**
**THERMAL, CALIFORNIA**

July 14, 2006

© 2006 Earth Systems Southwest
Unauthorized use or copying of this document is strictly prohibited
without the express written consent of Earth Systems Southwest.

File No.: 10185-04
06-07-738

D.FIEGL-000663



**Earth Systems**
Southwest

79-811B Country Club Drive
Bermuda Dunes, CA 92203
(760) 345-1588
(800) 924-7015
FAX (760) 345-7315

July 14, 2006

File No. 10185-04
06-07-738

Van Buren Estates, LLC
750 Menlo Avenue, Suite 250
Menlo Park, California 94025

Attention:   Mr. Thomas Lodato

Subject:     **Report of Preliminary Groundwater and Liquefaction Assessment**

Project:     **Proposed Residential Development**
Northeast Corner of Van Buren Street and Avenue 60
Thermal, California

Reference:   Earth Systems Southwest, *Geotechnical Engineering Report, Proposed Residential Development, Northeast Corner of Van Buren Street and Avenue 60, Thermal, Riverside County, California,* File No.: 10185-01, Document No.: 05-07-732, dated July 11, 2005.

Dear Mr. Lodato:

Earth Systems Southwest [ESSW] is pleased to present this report concerning our preliminary assessment of the depth to groundwater and liquefaction potential for the site referenced above. Note that this report was prepared for the exclusive use of Van Buren Estates, LLC. Any other use of this report is at the sole risk of the user.

We trust this report meets your needs at this time.  If we can be of further assistance, please contact the undersigned at (760) 345-1588.

Sincerely,
**EARTH SYSTEMS SOUTHWEST**

Scot A. Stormo, PG 4826, CHG 204
Associate Hydrogeologist

Craig S. Hill
CE 38234

D.FIEGL-000664

July 14, 2006                                    i                            File No.: 10185-04
                                                                                       06-07-738

## TABLE OF CONTENTS

Page

1.0   Introduction.................................................................................................1

2.0   Purpose and Scope of Work....................................................................1

3.0   Findings......................................................................................................3

4.0   Interpretation and Discussion................................................................3

5.0   Limitations.................................................................................................4

Appendix A
         Figures and Tables

EARTH SYSTEMS SOUTHWEST

D.FIEGL-000665

July 14, 2006                               1                         File No.: 10185-04
                                                                              06-07-738

## 1.0   Introduction

Earth Systems Southwest [ESSW] is pleased to present this supplemental report concerning our preliminary assessment of the depth to groundwater and liquefaction potential for the site referenced above. The "site" consists of both a working equestrian ranch (APNs 759-080-011, 759-090-001, and 759-090-002) and undeveloped desert land (APNs 759-080-008 and 759-090-003). The site location is depicted in Figure 1. The developed portion of the site contains corrals, fenced pastures, fenced irrigated fields for hay production, tack buildings for horses, storage buildings, a hay barn, several residences, and miscellaneous other storage structures. Most of the corral and field areas are covered in grass. The ranch areas are periodically irrigated. We understand that the irrigated portions of the site are underlain by a tile drain system.

ESSW completed a geotechnical investigation for this site in October 2004. The geotechnical investigation report included logs from eight borings drilled between 16.5 feet and 49 feet below ground surface [bgs] and four Cone Penetrometer Test [CPT] soundings to approximately 50 feet bgs. The eight borings and four CPT soundings were widely scattered across the site (See Figure 2). The boring logs indicate that groundwater was encountered as shallow as 4 feet bgs in B-5, located in the central portion of the site, to as deep as 14 feet bgs in B-2 and B-3, located in the southern portion of the site. The average depth to groundwater using data from all eight borings was approximately 10 feet bgs. It should be noted that there is a 10-foot or more variation in the elevation of the ground surface on-site, and that the variable depths to groundwater were partly a function of the surface topography. The relatively shallow depth to groundwater combined with the loose nature of fine-grained sediments under the site caused ESSW to state in the geotechnical report that the potential of liquefaction was considered very high.

## 2.0   Purpose and Scope of Work

The purpose of this investigation was to confirm and refine the information concerning the depth to groundwater, and reassess the potential for liquefaction to occur during a seismic event. The scope of work involved the following:

1. The County of Riverside Department of Health was contacted to obtain well permits for the site. Due to the temporary nature and shallow depths of the piezometers, the County indicated that well permits were not required.

2. Coachella Valley Water District [CVWD] records were reviewed to investigate the location and depth of the drainage and storm-water tile system at the site.

3. Water-level observation wells (also known as piezometers) were installed on June 2 and 5 to a nominal depth of 15 feet in twelve locations within the site. Eight of the piezometers were completed as close as practical to the ESSW geotechnical borings. The other four piezometers were drilled near the CPT soundings. Since the borings were located in the immediate vicinity of previously logged borings, soil samples were not collected during piezometer installation to save time and cost. The soils encountered in the borings were logged from the cuttings exhumed during drilling.

D.FIEGL-000666

July 14, 2006                                    2                          File No.: 10185-04
                                                                                        06-07-738

4.  The piezometers were constructed of 2-inch diameter PVC pipe with 10 to 15 feet of slotted interval extending from 5 feet bgs to the base of the boring. Blank PVC pipe was used from 5 feet to ground surface. An additional 5 feet of pipe was left sticking up above the ground surface so that the piezometers would be easy to find. The annular space was backfilled with Monterey Sand #3, or equivalent, to at least 2 feet above the top of the screen interval. A minimum 2-foot thick layer of bentonite pellets was placed above the sand pack to isolate the test interval from the rest of the soil column. The well casing was cemented into place, in accordance with State and County regulations, to protect the well from infiltration of surface contaminants. The wells were fitted with a locking, screw-on cap.

5.  The piezometers were surged during or soon after installation to increase the connectivity of the piezometer to the aquifer.

6.  The depth to water was measured in each piezometer on June 5 and June 12, 2006. Because some of the piezometers had been installed on June 5, only the June 12 data was used in the evaluation. The water levels were measured to an accuracy of 0.01 foot using a water level measuring sonde. The top of the well casing was used as the reference point for these measurements. The height of the casing above the ground surface was also estimated at each location, and ranged from 5 to 5½ feet.

7.  The electrical conductivity of the groundwater in each piezometer was measured on June 12, 2006. The conductivity meter was calibrated before use.

8.  The elevations of the piezometers were proposed to be surveyed by a licensed surveyor to allow for accurate groundwater flow direction evaluation. However, the surveyor did not perform their task in a timely manner. Therefore, ground surface elevations were obtained from Tentative Tract Map 34556, which has a 1-foot contour interval. The accuracy of our measurement is assumed to be about ± ½-foot. These values were used to convert the depth-to-water measurements to groundwater elevation values.

9.  The data obtained from the water level measurements were going to be used to re-evaluate the potential for liquefaction. However, the depths to groundwater measured in this project were not significantly different than the values used in the ESSW geotechnical report, and therefore the liquefaction potential was not re-evaluated.

10. This report has been prepared to document our activities, findings, conclusions, and recommendations.

Note that the original scope of work included destroying the peizometers after an appropriate number of groundwater measurements had been collected. This will include pulling the PVC piping out of the ground, over-drilling the borehole to 5 feet bgs, and backfilling with bentonite slurry to grade. The piezometers have not been destroyed as of the date of this report, but can be upon the verbal direction of the client.

EARTH SYSTEMS SOUTHWEST

D.FIEGL-000667

## 3.0    Findings

Soils were observed to consist of sandy silts and silty sands, consistent with the soil types observed during the geotechnical investigation in 2004. Groundwater was encountered during drilling at depths of between 7 and 13½ feet, generally consistent with the geotechnical investigation except that groundwater was only 4 feet deep in one of the borings in 2004. That boring (B-5) was located near the center of the site, in an area that was actively being irrigated at that time. During this current evaluation, groundwater was found at a depth of 11.5 feet at that location (P-5). We suspect the shallower groundwater in 2004 was related to the irrigation that was occurring at that time.

The depth to groundwater in the piezometers on June 12, 2006, as measured from the top of the casing, is summarized in Table 1. Table 1 also presents information concerning the elevation of the ground surface (as obtained from the Tentative Tract Map), the height that the well casing sticks above the ground, and the conversion of the depth to groundwater information into groundwater elevation readings. Two sets of elevations are provided; the first is based on Mean Sea Level [MSL], and the second is MSL plus 500 feet to avoid negative numbers. The discussion presented in this report will use the +500 feet values. The conductivity readings for the piezometers are also listed. The groundwater elevation data are also presented graphically in Figure 3.

As shown in Table 1, the depth to groundwater measured in the piezometers ranged from 6.1 to 13.6 feet below ground surface. Therefore, the computed ground surface elevations ranged from 392.5 to 406.5 feet. Groundwater elevations ranged from 386 to 395 feet. (Note that the groundwater elevations have been rounded to the nearest foot to reflect the uncertainty in the ground surface elevation). Areas with the greatest depths to groundwater coincided with areas with the highest ground surface elevations, so that the groundwater elevations were more uniform than would be suggested by the depth to water data. The groundwater elevation in the middle of the site is relatively flat with a gentle slope to the east while the groundwater along the northern and southern boundaries is several feet higher in elevation (see Figure 3). Groundwater in the site vicinity generally slopes to the south-southeast, toward the Salton Sea, so the on-site gradient fits the regional gradient in the northern half of the site but does not fit the regional gradient in the southern half of the site (and particularly at piezometers P-10 and P-11 in the southern-most portion of the site).

The conductivity readings were similar in 10 of the 12 piezometers, with values ranging from 1,450 to 4,330 uS/cm. The other two piezometers, P-10 and P-11, had conductivity values of 26,700 and 21,200 uS/cm, respectively, indicating this water was significantly saltier.

## 4.0    Interpretation and Discussion

It is our opinion that the relatively flat groundwater gradient in the central portion of the site is an artifact of the agricultural tile-drain system, which serves to drain water from the soil. Groundwater in an area with a tile-drain would be lowered toward the level of that drain. Tile drains are typically 7 to 10 feet below the ground surface and slope toward a property boundary. In this instance, the tile drain is suspected to slope to the east.

EARTH SYSTEMS SOUTHWEST

D.FIEGL-000668

The higher groundwater level in the northern-most piezometers (P-12) is likely due to a combination of recharge from the adjacent agricultural field, the lack of tile drains on the site in that area, and the probable presence of a different (higher) drainage system on the adjacent property. The higher groundwater level in the southern portion of the site is likely due to water from another source being recharged in that vicinity. This interpretation is supported by the high conductivity values obtained in those two piezometers (P-10 and P-11).

Development of the site will likely include the removal of the tile drain system, as well as cessation of irrigation activities. These changes will have opposite effects on the groundwater, and together may combine to either raise or lower the uppermost groundwater table. Residential irrigation by the future residents may also cause a rise in the groundwater table. Therefore, installing subsurface drainage should be considered during development. Ground surface elevations are expected to change as part of grading activities. This will affect the depth to groundwater even if the groundwater elevation does not change. We do not have detailed grading plans, and therefore cannot comment on the anticipated depth to groundwater after grading is completed. It should be noted that the groundwater elevations in P-10, P-11, and P-12 already exceed the current ground surface elevation in the eastern-central portion of the site.

Re-evaluation of the liquefaction potential was originally requested to be included in the scope of this project. However, the groundwater depths observed during this investigation were not significantly deeper than observed in 2004, and a re-evaluation would not have altered the results beyond the degree of uncertainty inherent in the analysis. Therefore, we believe the original liquefaction evaluation is still valid. It should be noted that the liquefaction evaluation estimated ground subsidence to be as much as 4.6 inches, with a differential building settlement of about 2½ inches. Other ground surface disruption, including cracking and soil boil formation, were also identified as a potential constraint.

Several mitigation strategies were discussed in the referenced geotechnical report with regards to the liquefaction issues, groundwater, potentially expansive soils, and other geologic constraints. Some or all of these issues affect most of the properties in the vicinity of the subject site (and in the eastern part of the Coachella Valley) to varying degrees. Many mitigation strategies for similar geologic constraints have been successfully implemented on other projects in the site vicinity. ESSW has successfully mitigated, and is aware of others who have successfully mitigating these types of constraints to the satisfaction of the governing agencies on properties in the site vicinity. These mitigations have involved one or more of the methods described in the referenced geotechnical report. The choice of mitigation strategy is dependant on several factors, including cost and design limitations. It is beyond the scope of this current investigation to evaluate which of these mitigation strategies would be most appropriate for the subject site. The selection of the appropriate mitigation strategy should be discussed by the entire design team (engineers, architects, planners, etc.), since non-geotechnical factors may play an important role in the selection.

## 5.0   Limitations

The lack of surveyed elevations is one of the limitations affecting this investigation, and limited our ability to provide groundwater elevation corrections with the accuracy we prefer (+/- 0.01 feet). However, given the relatively large size of the site and the change in groundwater elevation across the site of several feet, we believe the accuracy obtained was sufficient to meet

D.FIEGL-000669

July 14, 2006                                     5                                    File No.: 10185-04
                                                                                              06-07-738

the needs of this investigation.  If a more detailed investigation of the groundwater flow is
desired, or if a more precise groundwater elevation evaluation is desired, the elevations of the
piezometers should be surveyed.

This report has been prepared for the exclusive use of Van Buren Estates, LLC.  The conclusions
and recommendations rendered in this report are opinions based on readily available information
obtained to date within the scope of the work authorized by the client.  The scope of work for
this project was developed to address the needs of the client and may not meet the needs of other
users.  Any other use of or reliance on the information and opinions contained in this report
without the written authorization of ESSW is at the sole risk of the user.

The results contained in this report are based upon the information acquired during the
investigation, and may include information obtained from third parties.  ESSW makes no claim
as to the accuracy of the information obtained from others.  It is possible that variations exist
beyond or between points explored during the course of the investigation, and that changes in
conditions can occur in the future due to the works of man, variations in rainfall, temperature,
and/or other factors not apparent at the time of the field investigation.

The services performed by ESSW have been conducted in a manner consistent with the level of
care and skill ordinarily exercised by members of our profession currently practicing under
similar conditions in the site vicinity.  No warranty is expressed or implied.

-o0o-

EARTH SYSTEMS SOUTHWEST

D.FIEGL-000670

**PRIVATE PLACEMENT MEMORANDUM VBE LIMITED PARTNERS EXHIBIT 5**

D.FIEGL-000671

PRIVATE PLACEMENT MEMORANDUM                                    CONFIDENTIAL

# VAN BUREN ESTATES PARTNERS, L.P.

### Up to $11,000,000 of Limited Partner Interests
### Minimum Subscription: $100,000

**General Partners:**
Van Buren Estates, L.L.C. and Van Buren Estates II, L.L.C.
846 Portola Road, Suite J
Portola Valley, California 94028
Telephone: Thomas E. Lodato at 650-207-6063 or 650-365-0673
or Henry Skade at 415-461-2811
Facsimile: Thomas E. Lodato at 650-851-2506 or Henry Skade at 415-464-4936
E-Mail: Thomas E. Lodato at tlodato@aol.com or Henry Skade at hskade@aol.com

THESE SECURITIES ARE SUBJECT TO A HIGH DEGREE OF RISK. SEE "RISK FACTORS."

|  | Price to Investors | Sales Commissions | Proceeds to Partnership |
|---|---|---|---|
| Minimum Investment | $100,000 | $0 | $100,000 |
| Minimum Offering | $9,000,000 | $0 | $9,000,000 |
| Maximum Offering | $11,000,000 | $0 | $11,000,000 |

The General Partners are offering Units on a best-efforts basis. This offering will terminate on the Offering Termination Date, August 31, 2007, unless the General Partners fix an earlier Offering Termination Date or extend the Offering Termination Date until any date not later than December 31, 2007. The General Partners do not receive any commissions or fees for sales of Units but, as the General Partners of the Partnership, receive expense reimbursements and, if the Partnership is profitable, a disproportionately large share of Profits. See "Plan of Distribution," "Benefits to the General Partners" and "Summary of Agreement – Distributions and Allocations."

THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE 1933 ACT OR APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES ADMINISTRATOR, NOR HAS THE SEC OR ANY STATE SECURITIES ADMINISTRATOR PASSED ON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.

Copy No.: _____

Offeree Name: _____

The date of this Private Placement Memorandum is June 26, 2007

D.FIEGL-000672

PRIVATE PLACEMENT MEMORANDUM                    **CONFIDENTIAL**

# VAN BUREN ESTATES PARTNERS, L.P.

### Up to $11,000,000 of Limited Partner Interests
### Minimum Subscription: $100,000

**THESE SECURITIES ARE SUBJECT TO A HIGH DEGREE OF RISK.   SEE "RISK FACTORS."**

**Van Buren Estates Partners, L.P.** (the "Partnership") owns the fee interest in the mostly undeveloped Property, which is near the City of La Quinta in the Coachella Valley in Riverside County, California. The Property is described in Appendix II and Schedule B of Exhibit A of this Memorandum. The General Partners have procured certain entitlements, and intend to procure additional entitlements, for the Property and then to sell the Property. The Partnership's principal objectives are to obtain appreciation through increases in the value of the Property and to make cash Distributions to Limited Partners, to the extent of Cash Available for Distribution. The Partnership cannot assure investors that these objectives will be attained. See "Business," Appendix II and "Risk Factors."

Initially, Subscription funds will be deposited in a special deposit account. Interest received, if any, on the funds in the special deposit account will be paid to the respective subscribers. If less than $9,000,000 (the "Minimum Offering") is subscribed by the Offering Termination Date, all Subscription funds will be returned to the subscribers promptly with any interest paid on such funds. If the Minimum Offering is achieved before the Offering Termination Date, the General Partners may close the special deposit account, admit Limited Partners and commence Partnership operations. Thereafter, the General Partners may deposit additional Subscription funds directly into the Partnership's general account. See "Plan of Distribution."

These securities are subject to restrictions on transfer and resale and may not be transferred or resold except as permitted under the 1933 Act and applicable state securities laws, pursuant to registration or exemption therefrom.

The information in this Memorandum is furnished on a confidential basis exclusively for your use and retention, and by accepting this Memorandum, you agree not to transmit, reproduce or make available to any other person (other than your legal, tax, accounting and other advisers) all or any part of this Memorandum without the General Partners' express written permission. Notwithstanding anything herein to the contrary, however, you (and each of your employees, representatives or other agents) may disclose to any and all persons, without limitation of any kind, the tax treatment and tax structure of the Partnership and any transactions described herein, and all materials of any kind (including opinions or other tax analyses) that are provided to you relating to such tax treatment and structure. This Memorandum contains information about the Partnership that investors ought to know before they decide whether to invest. Please read it carefully and retain it for future reference.

### Van Buren Estates, L.L.C. and Van Buren Estates II, L.L.C.
### Portola Valley, California

D.FIEGL-000673

**Depo Richard Soltysiak, engineer for Tom & Hank (11/28/11)          EXHIBIT 6**

D.FIEGL-000674

Richard Soltysiak                          November 28, 2011

1

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF RIVERSIDE, INDIO DIVISION


VAN BUREN ESTATES, LLC, a
Limited Liability Company;
VAN BUREN ESTATES II, LLC,
A Limited Liability
Company; VAN BUREN ESTATES,          No. INC
LP, a California Limited             10002614
Partnership,

             Plaintiffs,

     vs.

STEWART TITLE OF
CALIFORNIA, INC., a
Corporation; STEWART TITLE
GUARANTY COMPANY, a
Corporation, and DOES 1
through 20,

             Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~


DEPOSITION OF

RICHARD SOLTYSIAK

November 28, 2011

9:49 a.m.


225 South Lake Avenue, Suite 1400

Pasadena, California



Matthew Silvas, CSR No. 12929



**ESQUIRE**

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

D.FIEGL-000675

Richard Soltysiak                          November 28, 2011

51

1        THE WITNESS:   That's when I got the physical

2    copies.   I was told by CVWD a couple weeks prior to

3    that.   I set a meeting with them to launch the

4    design -- the final design of the project.   As we

5    indicated, the planning commission had been done with

6    this, and it went to the board of supervisors.   And

7    the last remaining item to be attended to by

8    discretionary approval would be the zone change.   So

9    I wanted to get a leg up on getting the design going,

10   and I set a meeting with CVWD just to do some

11   housekeeping.   "How do you want the thing submitted?

12   What would you like to see," blah, blah, blah, and

13   they said that there's an issue now with the map.

14       MR. RICE:   This is after the tentative map

15   was approved?

16       THE WITNESS:   The tentative map was

17   approved.   In fact, we had submitted -- concurrently

18   submitted an application to phase the map, because we

19   had a 301 lot subdivision, and the concern on the

20   owner's part is builders with that kind of appetite

21   were very limited, so let's phase it so they can take

22   the project down, you know, in pieces.   So we

23   submitted an application for that.

24       We went over to CVWD, and they said, "You

25   got" -- they alerted -- I don't want to say "alerted



ESQUIRE

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

D.FIEGL-000676

Richard Soltysiak                                      November 28, 2011

52

1   me," but several problems cropped up in that same

2   meeting, relating to infrastructure and whatnot,

3   servicing the site.  And this ag and irrigation was

4   one of the -- two of the items.

5   BY MR. LIN:

6       Q.    Okay.  And the -- this meeting, do you

7   recall when it occurred?

8       A.    I sent you an e-mail on it.  I'm -- mid- to

9   late October.

10      Q.    When did you first receive notice of the R/W

11  Notices with the irrigation lines?

12      A.    Exhibit 3.

13      Q.    Okay.  So you received notice of all these

14  documents for the first time in this e-mail?

15          MR. RICE:  October 31st, 2007 e-mail?

16          THE WITNESS:  Yeah.

17  BY MR. LIN:

18      Q.    Okay.  Now, who is Kelly Rain?

19      A.    Right-of-way over at -- she's a

20  right-of-way -- she works in a right-of-way

21  department at CVWD.

22      Q.    Who is Joe Jocelyn?

23      A.    He worked in the -- if I needed to receive

24  supporting documents, plans, or in this case --

25  actually, she handled the right-of-way.  The plans,



# ESQUIRE

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

D.FIEGL-000677

Richard Soltysiak                          November 28, 2011

53

1    he was the guy back then who would e-mail you plans

2    within -- we talked about that index map.  He would

3    go to those index maps and say, "Well, this is what I

4    need to send to use as guide the ship information out

5    of the request."

6        Q.    You testified earlier that you received ag

7    drain plans in 2006; correct?

8        A.    I'm guessing, yes.

9        Q.    Did you also receive irrigation plans from

10   the Coachella Valley Water District?

11       A.    Yes.

12       Q.    During the break, can you find those plans

13   for me on your computer?

14       A.    Yeah.  I can e-mail them to you.

15       Q.    Yeah.  That would be great.

16             When did you notify the principals of Van

17   Buren, Hank Skade and/or Tom Lodato, of the ag drain

18   easements?  That's the Bozarth and Strickland

19   easements.

20             MR. RICE:  Assumes facts not in evidence

21   that that's who he communicated with.

22             You can answer, if you spoke to them

23   directly.

24             THE WITNESS:  Yeah.  The fact of the matter

25   is, I may not have personally told them about this,



ESQUIRE

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

D.FIEGL-000678

54

1   and there's a couple reasons as to why.  One of the

2   reasons is -- well, let's go back to this October

3   meeting.  And, again, my thought in setting this

4   meeting is to get the plan check process -- get the

5   design and plan check process going and accommodate

6   CVWD in an efficient manner.

7        So there's an owner's representative on the

8   project, Steve Kleeman.  And Steve was going to

9   attend the meeting with me.  We always meet together.

10  And there's a couple reasons why.  He likes having

11  several sources of memory at meetings and whatnot,

12  you know, because human nature, you miss something,

13  but the other guy picks up on it.  He couldn't make

14  it to the meeting because he had a conflict with

15  another meeting.  So I soloed the meeting.  And I got

16  pistol whipped in this meeting, because there were

17  numerous issues that came out, not only the

18  facilities we're talking about today, but the sewer

19  infrastructure issues, water infrastructure issues,

20  and requirements for a tank site that they started

21  throwing at me.

22       So needless to say, I was in semi-shock

23  because I'm looking forward to moving the project

24  forward, and now I'm going backwards.  And it's the

25  type of thing where we don't -- we met with CVWD for



**ESQUIRE**

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

D.FIEGL-000679

Richard Soltysiak                                    November 28, 2011

55

1   sewer and water infrastructure.  How do you service

2   this site, you know.  And so there's that force main

3   we just talked about.  The direction I received was

4   on a temporary basis, tie into that force main.

5   You'll need a temporary lift station, because it's a

6   pressure facility, as we talked about, and just tie

7   along the frontage, and then build a dry sewer on the

8   frontage, so in the future somebody could connect to

9   it.  We're done with our infrastructure, pave, move

10  on.

11         And then in terms of water connection, we

12  were supposed to tie into Avenue 58 and Harrison

13  Street.  This is all based on meetings and whatnot,

14  because you have to have a handle on this stuff

15  because it relates to cost-site-infrastructure cost.

16  So over a period of time during the tentative map

17  process, the County has a series of meetings that

18  they call tactical review committee meetings, and all

19  these various agencies that have had maps distributed

20  to them, sit at a table and tell you, "Okay.  Here's

21  what you have to do to move forward in order for us

22  to approve your project."  And as time goes on,

23  people get checked off, planning staff approves the

24  project to go to a public hearing.  They obviously

25  don't want a project to go to public hearing and have



**ESQUIRE**

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

D.FIEGL-000680

Richard Soltysiak                                    November 28, 2011

56

1   chaos in a public hearing where an agency gets up and

2   says, "We don't like this."  You try to minimize

3   those types of occurrences.  You'll get it from the

4   public, because, you know -- as we all know,

5   spontaneous reaction from the public for whatever

6   reason, but you try to keep it as tidy as possible to

7   keep it in-house, meaning the agency, and resolve

8   them up front.  So that's why we meet with CVWD to go

9   over, "Okay.  We've got points of connection, blah,

10  blah, blah."  They check it off.

11          I go to this meeting, and all of a sudden,

12  they turn the tables on me, water tanks, "You have to

13  go a mile a find a sewer."  It suddenly gets

14  dependant on a public works project that hasn't been

15  designed yet.  Mainly you have to run down Van Buren

16  Street to Avenue 62.  Avenue 62, major CIP $8 million

17  facility they're supposed to build.  Now, all this is

18  up in the air because they haven't designed it.

19          Remember I was just saying that our

20  understanding is on a temporary basis, we tie into

21  this force main and we build a dry sewer on the

22  frontage for someone to connect to in the future for

23  future use, because it's not going anywhere until all

24  this big infrastructure gets built.  And then in the

25  same type of thinking, they're telling us to go all



**ESQUIRE**

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

D.FIEGL-000681

1    over the place with an 18-inch waterline, tying to

2    Harrison at Avenue 58, but that may not be adequate

3    from a loop system and all this kind of stuff.  And

4    then, "Hey, we have pipe facilities running down the

5    middle of your lots."  So I'm in a state of shock

6    because I'm like, "How did we get this far?"

7          So I communicate with Steve Kleeman,

8    "Houston, we have a problem here."  So I probably

9    didn't -- I didn't call Hank and Tom, because there

10   is no way I would call them up and say, "We have a

11   problem.  What are we supposed to do," because I'm an

12   engineer that's supposed to solve problems.  And I'm

13   not going to get many future contracts if I give my

14   clients coronaries without a solution.

15          So what we determined, Steve and I, because

16   we're working together, was, Okay -- first of all,

17   Steve is like, "Well, you better make sure you didn't

18   screw this up, you didn't miss these easements."  And

19   I'm no different than any other human, my first

20   reaction is, "Man, I better go check this because

21   this is bad because it is destroying our map because

22   we have a series of residential lots with pipelines

23   running under them."  So we attempted to set meetings

24   with CVWD, because this was the meeting -- the

25   roundtable discussion where everyone took a punch at



ESQUIRE

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

D.FIEGL-000682

Richard Soltysiak                                    November 28, 2011

58

1   me, basically.  "You have water tank," this that.
2   They're basically destroying the project, in my mind.
3   I'm looking forward -- you know, work is starting to
4   go down.  I'm looking forward to moving forward with
5   the project, and all of a sudden the agency is
6   destroying it -- the viability of it by saying all
7   this infrastructure and these pipelines running down
8   the middle.
9           So we wanted to do the research, find out if
10  I didn't make a mistake or not with respect to the
11  irrigation.  I mean, the water tank and all that kind
12  of stuff, that was just thrust upon us, but the
13  easement issue was obviously a major player in this
14  too.  So let's gather our thoughts, do the research,
15  get back with CVWD with a select group to scratch our
16  heads and say, "Hey, how did you guys sign off on
17  this map?"  Of course, they're a big agency, they
18  don't care, you go fix it type of deal.  But how are
19  we going to fix it?  Are we going to redo the map.
20  But if we do that, we're going to have to go back to
21  the Vista Santa Rosa Community Counsel, and they're
22  a -- not an easy group to contend with.
23          And then if we do go to them, we're going to
24  have to go through the whole map process again.  So
25  after -- the principals paid a lot of money to get



# ESQUIRE

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

D.FIEGL-000683

64

1   miss something that's in there that just destroyed

2   this project.  That puts me in a pickle.

3          Once you put that aside, I got the tank

4   issues.  I mean, this is big-buck stuff, you know,

5   off-site sewer, off-site water.  So I got a whole

6   bunch of moving parts going in this meeting.  So,

7   again, I definitely called Steve immediately to say,

8   "Hey, this is bad.  I wish you were here to hear this

9   because we have to figure out what we're going to do

10   here to salvage this thing."

11  BY MR. LIN:

12     Q.   So aside from the easements -- the ag

13  easements -- agricultural easements and the

14  irrigation easements, the Coachella Valley Water

15  District also raised issues with the tank -- water

16  tank?

17     A.   Yeah.  They started saying, "Okay.  You guys

18  either need to build or pay a fair share into a water

19  tank, because we're at our limits here as far as what

20  we can provide to this property."  And the point

21  being is this is new information, you know.  This

22  isn't something I said, "Well, we'll worry about this

23  later."  This is big-time stuff that just came up.

24     Q.   So we've got water tank issues.  We've got

25  off-site sewer issues?



**ESQUIRE**

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

D.FIEGL-000684

Richard Soltysiak                          November 28, 2011

69

1   thing because of this caving in.  You may have to go
2   a couple few miles to the east to our sewer treatment
3   plant, but you have to build a full-size line."  And,
4   again, that's $8 million, $12 million worth of work.
5   And with 301 lots, you're going to have a hard time
6   sustaining that load.  So that's what I'm dealing
7   with at the time.
8          So Hank and Tom aren't -- how do I put
9   this -- they're not -- they hired Steve and me to fix
10  things, you know.  It's an investment for them, Van
11  Buren Estates.  So for me to call them up and say,
12  "Oh, my God.  What do you want me to do," it wouldn't
13  be appropriate for my client, to drop this.  They
14  need solutions.
15         So it took a while to weed through all this
16  stuff.  Because in some cases, sewer and ag
17  relocations are related because they're gravity
18  facilities and they run through the site.  We can get
19  into the details, if you're interested in that.  So
20  there's a relationship with all these moving parts.
21  So it took some time for me to digest.  And, again, I
22  wasn't the owner's representative.  It wouldn't have
23  been appropriate for me to bypass Steve Kleeman and
24  just start calling these guys, because he's their
25  boots on the ground.  So I definitely called him, no



**ESQUIRE**

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

D.FIEGL-000685

**STEWART TITLE PRELIMINARY REPORT   (Dec 2007)**          **EXHIBIT 7**

D.FIEGL-000686



**stewart**
title of california

Sanctity of Contract

### STEWART TITLE OF CALIFORNIA, INC., INLAND EMPIRE DIVISION
3403 TENTH STREET, SUITE 400
RIVERSIDE, CA 92501
(951) 276-2700     www.stsales.com

MEMBER CALIFORNIA LAND TITLE ASSOCIATION

## PRELIMINARY REPORT

VAN BUREN ESTATES
750 MENLO AVENUE #250
MENLO PARK, CA 94025
Attention: TOM LODATO

Order Number: 511419246          Your Reference:  VAN BUREN ESTATES

In response to the above referenced application for a Policy of Title Insurance, Stewart Title of California, Inc. hereby reports that it is prepared to issue, or cause to be issued, as of the date hereof, a Policy or Policies of Title Insurance describing the land and the estate or interest therein hereinafter set forth, insuring against loss which may be sustained by reason of any defect, lien or encumbrance not shown or referenced to as an Exception on Schedule B or not excluded from coverage pursuant to the printed Schedules, Conditions, and Stipulations of said Policy forms.

The printed exceptions and exclusions from the coverage of said policy or policies are set forth in the attached list. Copies of the policy forms should be read. They are available from the office which issued this report.

**Please read the exceptions shown or referred to below and the exceptions and exclusions set forth in Exhibit A of this report carefully. The exceptions and exclusions are meant to provide you with notice of matters which are not covered under the terms of the title insurance policy and should be carefully considered.**

**It is important to note that this preliminary report is not a written representation as to the condition of title and may not list all liens, defects, and encumbrances affecting title to the land.**

This report, (and any supplements or amendments thereto) is issued solely for the purpose of facilitating the issuance of a policy of title insurance and no liability is assumed hereby. If it is desired that liability be assumed prior to the issuance of a policy of title insurance a binder or commitment should be requested.

Dated as of December 10, 2007 at 7:30 A.M.
Print date: December 13, 2007
### Updated

MIKE REEVES, Title Officer
(800) 637-2769  Fax: (951) 276-2306

D.FIEGL-000687

**DOZIER'S $40M APPRAISAL 12/14/07**                    **EXHIBIT 8**

D.FIEGL-000688

## DOZIER APPRAISAL COMPANY
### Resort and Urban Property Appraisers
### Valuation and Financial Consultants

73-350 EL PASEO, SUITE 206
PALM DESERT, CALIFORNIA 92260

RAYMOND L. DOZIER, MAI
CERTIFIED GENERAL APPRAISER
LICENSE # AG004598

TEL. (760) 776-4280
FAX (760) 776-4977
E-MAIL Dozierappraisal@ds.rr.com

December 14, 2007

Mr. Tom Lodato
750 Menlo Avenue, Suite 250
Menlo, CA  94025

RE:   *"As Is" Market Value Appraisal of 163.87 Gross Acres of Vacant Land located on the Northeast Corner of Avenue 60 and Van Buren Street Thermal, California  92274.*

Mr. Lodato:

Enclosed is the amended "AS IF ENTITLED" MARKET VALUE appraisal of 163.87 Gross Acres of Vacant Land located on the Northeast Corner of Avenue 60 and Van Buren Street, Thermal, CA  92274. This letter is incorporating by reference the original "AS IS" Market Value appraisal of 163.87 Gross Acres of Vacant Land located on the Northeast Corner of Avenue 60 and Van Buren Street Thermal, California  92274, dated December 4, 2007 Dozier File #07-186-LHP. This appraisal was made at the request and agreement between Mr. Tom Lodato and Dozier Appraisal Company. Mr. Lodato is the client and intended user of this report.

The purpose of this appraisal is to estimate the "As Is" Market Values of the Real Property Interest of the subject's 163.87 gross acres of Vacant Land as if sold to a single purchaser as of the appraiser's date of inspection December 4, 2007. In the "as is" scenario, the property will be appraised at whatever stage of development (entitlement process) as of the effective date of appraisal, December 4, 2007. All elements of a MARKET VALUE sale are to be present in terms of the price upon which a willing and well-informed seller and a willing and well-informed buyer would agree, in the absence of any unusual compulsion on either, and reasonable exposure on the open and competitive market. Reasonable exposure time in MARKET VALUE estimates precedes the specified date (effective date) of the appraisal. MARKET VALUE also assumes an open and competitive market of the property interest being appraised. The function of the appraisal is to establish collateral for possible acquisition lending.

The property rights being appraised are the unencumbered Fee Simple Interest of all future benefits that may be derived from the property's present or possible use, except for easements and rights-of-way of record.

To develop this appraisal, Raymond L. Dozier, MAI has made a personal inspection of the subject property. In addition, he has reviewed sales of comparable properties, performed a highest and best use analysis and a land residual analysis and has weighed and compared the data to arrive at the estimated value of the subject property. The effective date of this appraisal is December 4, 2007.

D.FIEGL-000689

Page 2
Dozier Appraisal Company

This report is subject to the enclosed Assumptions and Limiting Conditions, the Certification and the Scope of the Appraisal on Page 12. The following extraordinary assumptions, hypothetical conditions and major highest and best use conclusions are being made:

- The hypothetical condition is being made that the subject property is 100% fully entitled as of the date of appraisal, December 4, 2007 (Hypothetical Condition)

- There is a reasonable probability that Avenue 59 will never extend through any portion of the subject property and any development of this roadway has effectively been abandoned by the County of Riverside. (Highest and Best Use Conclusion).

- The subject property is currently improved with a working horse ranch. The highest and best use analysis indicated that any income derived from the current lease on the subject property's horse ranch, will be off-set by the cost of demolition leaving no contributory value of the current improvements. (Highest and Best Use Conclusion).

Otherwise there are no extraordinary or special assumptions regarding this appraisal. Also, this letter of transmittal is not the completed appraisal report but a statement of value conclusions. Users of this appraisal are encouraged to read the completed attached report to reach the appraiser's conclusions via the appraisal process.

The intention of this appraisal report is to comply fully with FIRREA appraisal guidelines, as well as the current Uniform Standards of Professional Appraisal Practice (USPAP) adopted by the Appraisal Standards Board of the Appraisal Foundation; the requirements of the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute. The departure provision shall not apply.

The undersigned does not have any personal interest, either present or contemplated, in the subject property and certifies that fees received or to be received, for the employment of my services are not contingent on the opinions reported herein. In addition, the undersigned meets the Competency Provision Standard (1.1a, b, and c) as required by USPAP and has the knowledge and experience to complete the assignment competently.

Therefore, based upon my investigation and analysis of the data gathered with respect to this assignment, I have formed the opinion that the "AS IF ENTITLED" MARKET VALUE of the subject property, as of the effective date December 4, 2007, is measured in the amount of:

**$40,386,000 ($246,451/Acre or $134,173/Paper Lot)\***

**(FORTY MILLION THREE HUNDRED EIGHTY SIX THOUSAND DOLLARS)**

Reasonable exposure time necessary to sell this property to a single purchaser prior to the date of this appraisal is estimated to be 6 to 8 months.

---

\*Based on hypothetical conditions, extraordinary assumptions and major highest and best use conclusions found in the letter of transmittal. If any of the hypothetical conditions, extraordinary assumptions and major highest and best use conclusions prove to be false, the indicated value could be highly impacted.

Page 3
Dozier Appraisal Company

Respectfully submitted,
DOZIER APPRAISAL COMPANY

Raymond L. Dozier, MAI
State Certified General Real Estate Appraiser
CA. Cert. No. AG004590
RLD/ LHP 07-186

*DOZIER APPRAISAL COMPANY*

D.FIEGL-000691

## CERTIFICATION

I certify, that, to the best of my knowledge and belief . . .

- The statements of fact contained in this report are true and correct.

- The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions, and are my personal, unbiased professional analyses, opinions, and conclusions.

- I have no present or prospective interest in the property that is the subject of this report, and I have no personal interest or bias with respect to the parties involved.

- I have no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

- My engagement in this assignment was not contingent upon developing or reporting predetermined results.

- My compensation is not contingent upon the reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value estimate, the attainment of stipulated result, or the occurrence of a subsequent event.

- My analyses, opinions, and conclusions were developed, and this report has been prepared in conformity with the Uniform Standards of Professional Appraisal Practice.

- I have made a personal inspection of the property that is the subject of this report.

- Ms. Lori Pabros, independent contractor, provided significant professional assistance to the person signing this report. Mr. Raymond L. Dozier, MAI, performed final analysis of market data in determining indication of value.

- The appraisal assignment was not based on a requested minimum valuation, a specific valuation, or the approval of a loan.

- I certify that, to the best of my knowledge and belief, the reported analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the requirements of the Code of Professional Ethics and the Standards of Professional Appraisal Practice of the Appraisal Institute.

- I certify that the use of this report is subject to the requirements of the Appraisal Institute relating to review by its duly authorized representatives.

- As of the date of this report I, Raymond L. Dozier, MAI, have completed the requirements of the continuing education program of the Appraisal Institute.

Raymond L. Dozier, MAI
State Certified General Real Estate Appraiser
CA. Cert. No. AG004590

*DOZIER APPRAISAL COMPANY*

D.FIEGL-000692

## Discounted Cash Flow and Land Residual Assumptions

| Date of Appraisal: | | December 4, 2007 |
|---|---|---|
| Holding period: (From Raw Land Fully Entitled) | | 72 Months |
| Number of Lots | 301 | |
| Average Lot Price | $270,076 | |
| Total Selling Price | $81,239,000 | Aggregate Retail Value |
| Annual Appreciation | 2.5% | CPI & Inflation as offset |
| Absorption per month | 5 | 5 lots per month |
| Months to Absorb | 60 | From Completion to Sell Out |
| Other Income | -0- | |
| Present Value Factor (Property Discount Rate) | | 10.00% Land Residual Fully Entitled |
| Total Aggregate Retail Value Estimate: | | $81,239,000 |

### Discounted Cash Flow and Land Residual Analysis for 301 Lots

The following page contains the discounted cash flow income and expense calculations related to the subject's 301 residential paper lots "as if entitled" and ready for sale upon the effective date of the appraisal.

*DOZIER APPRAISAL COMPANY*

D.FIEGL-000693

Discounted Cash Flow Analysis Solving for the "As If Entitled" Market Value of 301 residential paper lots.

*DOZIER APPRAISAL COMPANY*

# "AS IF ENTITLED" MARKET VALUE OF 163.87 Acres



D.FIEGL-000695

**PRIVATE PLACEMENT MEMORANDUM VBE LENDERS, LLC**          **EXHIBIT 9**

D.FIEGL-000696

PRIVATE PLACEMENT MEMORANDUM                    CONFIDENTIAL

# VAN BUREN ESTATES LENDERS, LLC

**Up to $17,500,000 of Membership Interests**
**Minimum Subscription: $50,000**

**Manager:**
**RMC Management Co., LLC**
**1419 Burlingame Avenue, Suite R**
**Burlingame, California 94010**
**Telephone: 650-401-3235**
**Facsimile: 650-579-2610**
**E-Mail: john@rmcreloans.com**

**THESE SECURITIES ARE SUBJECT TO A HIGH DEGREE OF RISK. SEE "RISK FACTORS."**

| | Price to Investors | Sales Commissions | Proceeds to Company |
|---|---|---|---|
| Minimum Investment | $50,000 | $0 | $50,000 |
| Minimum Offering | $9,000,000 | $0 | $9,000,000 |
| Maximum Offering | $17,500,000 | $0 | $17,500,000 |

The Manager is offering Membership Interests on a best-efforts basis. This offering will terminate on the Offering Termination Date, April 30, 2008, unless the Manager fixes an earlier Offering Termination Date or extends the Offering Termination Date until any date not later than June 30, 2008. The Manager does not receive any commissions or fees for sales of Membership Interests but, as the Manager of the Company, receives fees for managing the Company and expense reimbursements. See "Plan of Distribution," "Compensation of and Benefits to the Manager" and "Summary of Agreement – Distributions and Allocations."

**THESE SECURITIES HAVE NOT BEEN REGISTERED UNDER THE 1933 ACT OR APPROVED OR DISAPPROVED BY THE SEC OR ANY STATE SECURITIES ADMINISTRATOR, NOR HAS THE SEC OR ANY STATE SECURITIES ADMINISTRATOR PASSED ON THE ACCURACY OR ADEQUACY OF THIS MEMORANDUM. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE.**

Copy No.: _____

Offeree Name: _____

The date of this Private Placement Memorandum is February 12, 2008

PRIVATE PLACEMENT MEMORANDUM                                    CONFIDENTIAL

# VAN BUREN ESTATES LENDERS, LLC

## Up to $17,500,000 of Membership Interests
## Minimum Subscription: $50,000

### THESE SECURITIES ARE SUBJECT TO A HIGH DEGREE OF RISK.  SEE "RISK FACTORS."

**Van Buren Estates Lenders, LLC** (the "Company") is being organized to make the Loan to Van Buren Estates Partners, L.P., a California limited partnership (the "Fund"), to refinance, in part, a loan made by another lender to the Fund that is secured by a first deed of trust on the Property owned by the Fund.  The Property, which is mostly undeveloped, is near La Quinta, California.   The legal description of the Property is in Exhibit B of the Agreement (which is Exhibit A of this Memorandum).   The Fund has procured a tentative subdivision tract map, and intends to procure a final tract map, for the Property and then to sell the Property.  The Company's principal objectives are to receive interest on its Loan to the Fund, to make quarterly cash distributions to Members, to the extent that the Manager determines that cash is available, and to receive repayment of the Loan within 1 to 2 years, the final maturity date being dependent on the aggregate amount of the Capital Contributions to the Company and, consequently, the amount of the Loan.  The Company cannot assure investors that these objectives will be attained.  See "Business" and "Risk Factors."

Subscription funds will first be deposited in a special deposit account.  Interest received, if any, on the funds in the special deposit account will be paid to the respective subscribers.  If less than the Minimum Offering is subscribed by the Offering Termination Date, all Subscription funds will be returned to the subscribers promptly with any interest paid on such funds.  If the Minimum Offering is achieved before the Offering Termination Date, the Manager may close the special deposit account, admit Members and commence the Company's operations by making the Loan to the Fund. See "Plan of Distribution."

**THESE SECURITIES ARE SUBJECT TO RESTRICTIONS ON TRANSFER AND RESALE AND MAY NOT BE TRANSFERRED OR RESOLD EXCEPT AS PERMITTED UNDER THE 1933 ACT AND APPLICABLE STATE SECURITIES LAWS, PURSUANT TO REGISTRATION OR EXEMPTION THEREFROM, OR WITHOUT THE CONSENT OF THE MANAGER. INVESTORS SHOULD BE AWARE THAT THEY MAY BE REQUIRED TO BEAR THE FINANCIAL RISKS OF THIS INVESTMENT FOR AN INDEFINITE PERIOD OF TIME.**

The information in this Memorandum is furnished on a confidential basis exclusively for your use and retention.  By accepting this Memorandum, you agree not to transmit, reproduce or make available to any other Person (other than your legal, tax, accounting and other advisers) any or all of this Memorandum without the Manager's express written permission.  Notwithstanding anything herein to the contrary, however, you (and your employees, representatives or other agents) may disclose to anyone, without any limitation, the tax treatment and tax structure of the Company and any transactions described herein, and any and all materials (including opinions or other tax analyses) that are provided to you relating to such tax treatment and structure.  This Memorandum contains information about the Company that you should know before deciding whether to invest.  Please read it carefully and retain it for future reference.

### RMC Management Co., LLC
### Burlingame, California

D.FIEGL-000698



**FIDELITY TITLE ESTIMATED CLOSING STATEMENT 3/10/08  EXHIBIT 10A**

D.FIEGL-000699



**Fidelity National Title Company**

1093 Foster City Blvd., Suite 201, Foster City, CA 94404
650 357-9030 • FAX 650 357-9031

## LENDER'S ESCROW INSTRUCTIONS

Date: March 10, 2008
Escrow No.: 08-60258823-A-MMF
Locate No.: CAFNT0933-0941-0011-06026823-A
Escrow Officer: Maura M. Freitas

I/We hand you herewith:

- Loan funds in the form of wire transfer, certified check, cashier's check, or teller's check payable to Fidelity National Title Company pursuant to the "Deposit of Funds," Paragraph 1 contained in the General Provisions attached hereto and made a part hereof

which you are authorized to deliver and/or record when:

You hold for my account the following:
- Original, executed promissory note corresponding to the above-referenced copy, with interest commencing at 14%, with all principal and interest due in its entirety on March 1, 2010
- Evidence of Hazard Insurance
- collect prepaid interest from borrower in the amount of $2,800,000.00 through escrow

AND, will deliver to you any instruments which this escrow requires shall be executed by me, all of which you are instructed to use provided that you hold an CLTA Standard Lender's Policy coverage form Policy of Title Insurance from Fidelity National Title Insurance Company with the usual title company's exceptions with a liability of $10,000,000.00, covering the following described property located in the City of unincorporated area , County of Riverside, State of California: SEE EXHIBIT "A" ATTACHED HERETO AND MADE A PART HEREOF

Borrower states that property address is:
59000 Van Buren Street, Thermal, CA 92274

SHOWING TITLE VESTED IN:
Van Buren Estates Partners, LP, a California Limited Partnership

FREE FROM ENCUMBRANCES EXCEPT:
1.  Current general and special taxes for the fiscal year in which this escrow closes, and taxes for the ensuing year, if any, a lien not yet due and payable;
2.  The lien of supplemental taxes, if any, assessed pursuant to the provisions of Chapter 3.5 (commencing with Section 75) of the Revenue and Taxation Code of the State of California;
3.  Bonds and Assessments with no delinquent payments, if any;
4.  Covenants, conditions, restrictions, reservations, easements and rights of way now of record, if any;
5.  Exceptions numbered 1, 12 through 23 and 30 inclusive as shown in your preliminary report.
6.  A First Deed of Trust, to record, securing a note in the amount of $10,450,000.00 in favor of Van Buren Estates Lenders, LLC, a California Limited Liability Company.
7.  A Second Deed of Trust, to record, securing a note in the amount of $10,000,000.00 in favor of George Fiegl.

ADDITIONAL INSTRUCTIONS:
1.  GOOD FUNDS-DISBURSE WHEN AVAILABLE: Borrower authorize and instruct Fidelity National Title Company to record all documents required in this escrow when all the conditions of this escrow have been met and upon receipt and deposit of all funds necessary to consummate this transaction in the form of a cashier's check, teller's check or certified check regardless of whether the funds are available for disbursement in accordance with Reg. CC. Immediately upon availability of the deposited instrument, Fidelity National Title Company is instructed to disburse all funds in accordance with these instructions and/or the attached estimated closing statement.

2.  The undersigned hereby authorize and instruct Escrow Holder to charge each party to the escrow for their respective Federal Express and/or special mail handling/courier fees. Unless specified in writing, by the undersigned, Escrow Holder is authorized to select special mail/delivery or courier service to be used.

Continued on Following Page
(kfnt14)(02-06)

Initials: _G.F._

D.FIEGL-000700

**FIDELITY TITLE FINAL CLOSING STMT 3/21/08**          **EXHIBIT 10B**



# Fidelity National Title Company

1098 Foster City Blvd., Suite 201, Foster City, CA 94404
650 357-9030 • FAX 650 357-9031

**DATE:** March 28, 2008                                              **TIME:** 2:48 PM
**ESCROW NO.:** 08-6026823-A-MMF
**LOCATE NO.:** CAFNT0933-0941-0011-06026823-A
**ESCROW OFFICER:** Maura M. Freitas                      **CLOSING DATE:** March 21, 2008

## BORROWER FINAL CLOSING STATEMENT

**LENDER:**            Van Buren Estates Lenders, LLC, a California Limited Liability Company
**BORROWER:**       Van Buren Estates Partners, LP
**PROPERTY:**         59000 Van Buren Street, Thermal, CA 92274

| | $ DEBITS | $ CREDITS |
|---|---|---|
| **FINANCIAL:** | | |
| New 1st Trust Deed to Van Buren Estates Lenders, LLC, a California Limited Liability Company | | 10,450,000.00 |
| New 2nd Trust Deed to George Fiegl | | 10,000,000.00 |
| **TITLE CHARGES:** | | |
| 41-FORMERLY ALTA Loan 1970/84 w/Form 1 for $10,450,000.00 | 8,146.00 | |
| Endorsement Fee(s) | 50.00 | |
| 01-L-CLTA Standard - 1990 for $10,000,000.00 | 4,772.00 | |
| Recording Trust Deed(s) | 87.00 | |
| Recording - sub/recons | 48.00 | |
| Recording - 2nd D/T | 40.00 | |
| **ESCROW CHARGES:** | | |
| Escrow Fee to Fidelity National Title | 250.00 | |
| Doc Prep Fees to Fidelity National Title | 150.00 | |
| Outside Courier/Special Messenger | 33.00 | |
| Notary Fees | 10.00 | |
| **NEW LOAN CHARGES - Van Buren Estates Lenders, LLC, a California Limited Liability Company** | | |
| **Total Loan Charges: $3,999,528.76** | | |
| estimated funds retained by lender to Van Buren Estates Lenders, LLC, a California Limited Liability Company | 3,999,528.76 | |
| **NEW LOAN CHARGES - George Fiegl** | | |
| **Total Loan Charges: $2,800,000.00** | | |
| prepaid interest to George Fiegl | 2,800,000.00 | |
| **PAYOFFS - AMC Investor Services** | | |
| **Total Payoff $13,180,271.92** | | |
| Principal Balance to AMC Investor Services | 13,000,000.00 | |
| Interest on Principal Balance at $5020.61 per day from 3/1/2008 thru 3/25/2008 to AMC Investor Services | 125,515.25 | |
| Forwarding/Demand Fee to AMC Investor Services | 30.00 | |
| Reconveyance Fee to AMC Investor Services | 45.00 | |

D.FIEGL-000702

**RECONVEYANCE HARBORD LOAN $6.4M**                    **EXHIBIT 11**

D.FIEGL-000703

**RECORDING REQUESTED BY:**
Fidelity National Title Company
Escrow No.: 08-6026823-A-MMF
Locate No.: CAFNT0933-0941-0011-06026823-A
Title No.: 33371524

**When Recorded Mail Document To:**
Van Buren Estates Partners, LP
c/o Tiburon Ventures
700 Larkspur Landing Circle,#199
Larkspur, CA 94939

DOC # 2008-0140145
03/21/2008 08:00A Fee:16.00
Page 1 of 1
Recorded in Official Records
County of Riverside
Larry W. Ward
Assessor, County Clerk & Recorder

| S | R | U | PAGE | SIZE | DA | MISC | LONG | RFD | COPY |
|---|---|---|---|---|---|---|---|---|---|
| 2 | | | 1 | 1 | 1 | | | | |
| M | A | L | 465 | 426 | PCOR | NCOR | SMF | NCHG | EXAM 051 |

T: | | CTY | UNI |

APN: 759-090-01,02,03,759-080-08,11

T 051

(16)

## SUBSTITUTION OF TRUSTEE AND FULL RECONVEYANCE

WHEREAS, **Van Buren Estates, LLC** was the original Trustor,
**Stewart Title of California, Inc.** the original Trustee, and
**Harbord Finance, LLC** the Beneficiary,
under that certain Deed of Trust dated **March 8, 2005** and recorded as instrument no. **0198823** on **March 11, 2005** in book n/a, page n/a, Official Records of the county of **Riverside**, State of **California**, and

WHEREAS, the undersigned Beneficiary desires to substitute a new Trustee under said Deed of Trust in place and instead of **Stewart Title of California, Inc.**

now therefore, the undersigned hereby substitutes
**Columbus Nova Partners, LLC, a Delaware Limited Liability Company**
as Trustee

under said Deed of Trust and
**Columbus Nova Partners, LLC, a Delaware Limited Liability Company**
as the substituted Trustee

does hereby reconvey, without warranty, to the person or persons legally entitled thereto, the Estate now held thereunder.

DATED: March 5, 2008

State of ~~California~~ New York          )
County of Manhattan                        )

On 11th day of March 2008 before me, Virginia L. West , Notary Public
(here insert name and title of the officer), personally appeared
ANDREW INTRATER  SENIOR MGING PTNER

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Virginia L. West_____ (Seal)

VIRGINIA L. WEST
Notary Public, State of New York
No. 01WE6138787
Qualified in New York County
Term Expires December 27, 2009

Columbus Nova Partners, LLC

BY: _____
                          Beneficiary

ANDREW INTRATER | SENIOR MANAGING DIRECTOR
(print name/title)

Columbus Nova Partners, LLC

BY: _____
                    Substituted Trustee

ANDREW INTRATER | SENIOR MANAGING DIRECTOR
(print name/title)

SUBSTITUTION OF TRUSTEE AND FULL RECONVEYANCE

D.FIEGL-000704

**RECONVEYANCE APPIAN MEZZ LOAN $5.2M**          **EXHIBIT 12**

D.FIEGL-000705

DOC # 2008-0140146
03/21/2008 08:00A Fee:16.00
Page 1 of 1
Recorded in Official Records
County of Riverside
Larry W. Ward
Assessor, County Clerk & Recorder

**RECORDING REQUESTED BY:**
Fidelity National Title Company
Escrow No.: 08-6026823-A-MMF
Locate No.: CAFNT0933-0941-0011-06026823-A
Title No.: 33371524

**When Recorded Mail Document To:**
Van Buren Estates Partners, LP
c/o Tiburon Ventures
700 Larkspur Landing Circle, #199
Larkspur, CA  94939

APN: 759-090-01,02,03,759-080-08,11

| S | R | U | PAGE | SIZE | DA | MISC | LONG | RFD | COPY |
|---|---|---|------|------|----|------|------|-----|------|
| 2 |   |   |      |      |    |      |      |     |      |
| M | A | L | 469  | 128  | PCOR | NCOR | SMF | NCHG | EXAM |
|   |   |   | T:   |      |    | CTY  | UNI  |     | 051  |

051

## SUBSTITUTION OF TRUSTEE AND FULL RECONVEYANCE

WHEREAS, **Van Buren Estates, LLC** was the original Trustor,
**Stewart Title of California, Inc.** the original Trustee, and
**Applan Mezz, LLC the Beneficiary,**
under that certain Deed of Trust dated **March 8, 2005** and recorded as instrument no. **0198825 on March 11, 2005** in book n/a, page n/a, Official Records of the county of **Riverside, State of California,** and

WHEREAS, the undersigned Beneficiary desires to substitute a new Trustee under said Deed of Trust in place and instead of **Stewart Title of California, Inc.**

now therefore, the undersigned hereby substitutes
**Columbus Nova Partners, LLC, a Delaware Limited Liability Company**
as Trustee

under said Deed of Trust and
**Columbus Nova Partners, LLC, a Delaware Limited Liability Company**
as the substituted Trustee

does hereby reconvey, without warranty, to the person or persons legally entitled thereto, the Estate now held thereunder.

DATED: March 5, 2008

State of ~~California~~ New York )
County of New York )

On 11th day of March 2008 before me,
Virginia L. West , Notary Public
(here insert name and title of the officer), personally appeared
ANDREW INTRATER SENIOR MGING DIRECTOR

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

VIRGINIA L. WEST
Notary Public, State of New York
No. 01WE6138787
Qualified in New York County
Term Expires December 27, 2009

Columbus Nova Partners, LLC
BY: _____
Beneficiary

ANDREW INTRATER / SENIOR MANAGING DIRECTOR
(print name/title)

Columbus Nova Partners, LLC
BY: _____
Substituted Trustee

ANDREW INTRATER / SENIOR MANAGING DIRECTOR
(print name/title)

FD-236 (Rev 12/07)        SUBSTITUTION OF TRUSTEE AND FULL RECONVEYANCE

D.FIEGL-000706

**RECONVEYANCE AGI 59th AVE LOAN $1.285M**                    **EXHIBIT 13**

D.FIEGL-000707

RECORDING REQUESTED BY:
Fidelity National Title Company
Escrow No.: 08-6036823-A-MWF
Locate No.: CAFNT00593-0941-0011-0602892093-A
Title No.: 3337152A

When Recorded Mail Document To:
Van Buren Estates Partners, LP
c/o Tiburon Ventures
700 Larkspur Landing Circle,#199
Larkspur, CA 94939

APN: 759-090-01,02,03,759-080-08,11

## SUBSTITUTION OF TRUSTEE AND FULL RECONVEYANCE

WHEREAS, Van Buren Estates II, LLC was the original Trustor,

Stewart Title of California, Inc, the original Trustee, and

**AGI 59th Avenue, LLC** the Beneficiary,

under that certain Deed of Trust dated June 30, 2005 and recorded as instrument no. 0550575 on July 11, 2005 in book n/a, page n/a, Official Records of the county of Riverside, State of California; and

WHEREAS, the undersigned Beneficiary desires to substitute a new Trustee under said Deed of Trust in place and instead of Stewart Title of California, Inc.

now therefore, the undersigned hereby substitutes
**AGI 59th Avenue, LLC**
as Trustee
under said Deed of Trust and
**AGI 59th Avenue, LLC**
as the substituted Trustee

does hereby reconvey, without warranty, to the person or persons legally entitled thereto, the Estate now held thereunder.

DATED: March 5, 2008

State of California
County of Marin

On March 7th, 2008 before me, Stephanie A. Ripley, Notary Public
(here insert name and title of the officer), personally appeared
Jonathan Lotter

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _____ (Seal)

Beneficiary

AGI 59th Avenue, LLC

BY: _____
Jonathan Lotter Manager
(print name/title)

Substituted Trustee

AGI 59th Avenue, LLC

BY: _____
Jonathan Lotter Manager
(print name/title)

STEPHANIE A. RIPLEY
Comm. # 1554567
NOTARY PUBLIC-CALIFORNIA
Marin County
My Comm. Expires Feb. 28, 2009

FD-236 (Rev 12/07)
SUBSTITUTION OF TRUSTEE AND FULL RECONVEYANCE
(subrecon)(12-07)

DOC # 2008-0140147
03/21/2008 08:00A Fee:16.00
Page 1 of 1
Recorded in Official Records
County of Riverside
Larry W. Ward
Assessor, County Clerk & Recorder

| S | R | U | PAGE | SIZE | DA | MISC | LONG | RFD | COPY |
|---|---|---|------|------|----|----|----|-----|------|
| M | A | L |  | 465 | 426 | PCOR | NCOR | SMF | NCHG | EXAM |

T 051

CTY UNI

**RECONVEYANCE ACM LOAN $13M**                    **EXHIBIT 14**

D.FIEGL-000709

RECORDING REQUESTED BY

AND

WHEN RECORDED MAIL TO

ACM INVESTOR SERVICES, INC.
17 E. Sir Francis Drake #200
Larkspur, CA 94939

Loan Number: 06190912

DOC # 2008-0242513
05/07/2008 08:00A Fee:11.00
Page 1 of 1
Recorded in Official Records
County of Riverside
Larry W. Ward
Assessor, County Clerk & Recorder

| S | R | U | PAGE | SIZE | DA | MISC | LONG | RFD | COPY |
|---|---|---|------|------|-----|------|------|-----|------|
| M | A | L | 465 | 426 | PCOR | NCOR | SMF | NCHG | EXAM 053 |
| | | | | | T: | | CTY | UNI | M 053 |

## DEED OF RECONVEYANCE

WHEREAS, the indebtedness secured by the Deed of Trust EXECUTED BY VAN BUREN ESTATES, LLC VAN BUREN ESTATES II and HANK SKADE, MANAGER & THOMAS LODATO, MGR A CALIFORNIA LIMITED LIABILITY COMPANY, TRUSTOR(S)

TO ACM INVESTOR SERVICES, INC., TRUSTEE(S), recorded 03/08/2006, as Instrument No. 2006-0164611, in Book/Reel n/a, Page/Image n/a, of Official Records in the Office of the County Recorder of RIVERSIDE, County, State of California, has been paid

NOW THEREFORE, the present Trustee(s) having received from the present owner of the beneficial interest under said Deed of Trust and obligations secured thereby a written request to reconvey by reason of the obligations secured by said Deed of Trust, DOES HEREBY RECONVEY, without warranty, to the person or persons legally entitled thereto, the estate, title and interest now held by it under said Deed of Trust in said County, California, describing the land therein.

4-25-08

BRUCE FONAROW, PRESIDENT                                                    Date
ACM INVESTOR SERVICES, INC.

STATE OF CALIFORNIA
COUNTY OF MARIN                    SS.
On 4-25-08                before me, Cynthia Schmaljohann               , a Notary Public,
Personally appeared BRUCE FONAROW

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature

Signature of Notary Public

CYNTHIA SCHMALJOHANN
Commission # 1580036
Notary Public - California
Marin County
My Comm. Expires May 19, 2009

Place Notary Seal Above

DEED_RCN.DOC

**APPLICATION FOR CHANGED ASSESSMENT**
**SUBMITTED 12/1/08**
**VALUE ASSERTED ACCURATE AS OF 1/1/08**

| | | |
|---|---|---|
| Parcel 759-090-001 | Applicant's Opinion of Value: | $ 1,557,900. |
| Parcel 759-090-002 | Applicant's Opinion of Value: | $ 1,800,000. |
| Parcel 759-080-008 | Applicant's Opinion of Value: | $ 1,558,800. |
| Parcel 759-080-011 | Applicant's Opinion of Value: | $   900,000. |
| Parcel 759-090-003 | Applicant's Opinion of Value: | $ 1,557,450. |
| **TOTAL APPLICANT'S OPINION OF VALUE** | | **$7,374,150.** |

**APPLICATION FOR CHANGED ASSESSMENT**              **EXHIBIT 15**

D.FIEGL-000711

BOE-' 05-AH (S1: REV.6 (5/20/08)

**APPLICATION FOR CHANGED ASSESSMENT:** This form contains all the requests for information that are required for filing an application for Changed Assessment. Failure to complete this application may result in rejection of the application and/or denial of the appeal. Applicants should be prepared to submit additional information if requested by the Assessor or at the time of the hearing. Failure to provide information the Appeals Board considers necessary may result in the continuance of the hearing.
PLEASE TYPE OR PRINT IN DARK INK.    SEE INSTRUCTIONS FOR FURTHER INFORMATION.

COUNTY OF RIVERSIDE - CLERK OF THE BOARD, P.O. BOX 1628, RIVERSIDE, CA. 92502-1628   (951) 955-1060

**APPLICATION # 2008**   DO NOT WRITE IN THIS SPACE - FOR OFFICE USE ONLY   08-24643

| YEAR/ROLL | NSA DATE | DIV/OFFICE | USE CODE |
|---|---|---|---|
| INITIALS OF CLERK | | DATE RECEIVED   12-1-08 | TIMELY?  ☐ YES  ☐ NO |

**1. APPLICANT'S NAME** (last, first, middle initial)
Van Burien Estates Partners, L.P.

STREET ADDRESS/P.O. BOX NUMBER (MUST be applicant's mailing address)
100 Larkspur Landing Circle, Suite 199

| CITY Larkspur | STATE C.A | ZIP CODE 94939 |
|---|---|---|

| DAYTIME PHONE (415) 461-2611 | ALTERNATE PHONE ( ) | FAX NUMBER ( ) |
|---|---|---|

E-MAIL ADDRESS

**2. AGENT OR ATTORNEY FOR APPLICANT**
W. Scott Phinney

STREET ADDRESS/P.O. BOX NUMBER
P.O. Box 1708

| CITY Lake Oswego | STATE OR | ZIP CODE 97035 |
|---|---|---|

| DAYTIME PHONE (503) 635-9343 | ALTERNATE PHONE (503) 551-0888 | FAX NUMBER (503) 635-1526 |
|---|---|---|

E-MAIL ADDRESS  scotphin@aol.com

**AGENT'S AUTHORIZATION**

If the applicant is a corporation, the agent's authorization must be signed by an officer or authorized employee of the business entity. If the agent is not an Attorney licensed in California or a spouse, child, or parent of the person affected, the following must be completed (or attached to this application—see instructions).

PRINT NAME OF AGENT AND AGENCY
W. Scott Phinney

is hereby authorized to act as my agent in this application and may inspect assessor's records, enter into stipulations, and otherwise settle issues relating to this application.

SIGNATURE OF APPLICANT/OFFICER/AUTHORIZED EMPLOYEE
☒   See attached

| TITLE | DATE |
|---|---|

**3. PROPERTY IDENTIFICATION INFORMATION** – Please complete.
ASSESSMENT, SUPPLEMENTAL, ESCAPE OR CORRECTED NUMBER (circle one)
759-090-001-5

PARCEL NUMBER (if different from above)

PROPERTY ADDRESS AND/OR LOCATION
NE COR VanBuren 060th, Thermal, CA

**PROPERTY TYPE:**
☐ Single-Family Residence/Condo/Townhouse
☐ Apartments (Number of Units _____)
☑ Commercial/Industrial   ☐ Vacant Land
☑ Agricultural   ☐ Other_____
☐ Business Personal Property/Fixtures
Is this property an owner-occupied single-family dwelling?  ☐ Yes  ☑ No

**4. VALUE**

| | A. VALUE ON ROLL | B. APPLICANT'S OPINION OF VALUE |
|---|---|---|
| LAND | 2561543 | 1557900 |
| IMPROVEMENT / STRUCTURES | 25,468 | -0- |
| FIXTURES | | |
| BUS. / PERSONAL PROPERTY | | |
| TREES & VINES | | |
| MINERAL RIGHTS | | |
| PENALTIES | | |
| NET TOTAL | 2587011 | 1557900 |

**5. TYPE OF ASSESSMENT BEING APPEALED** (check one)
**IMPORTANT — SEE INSTRUCTIONS FOR FILING PERIODS**

☑ Regular Assessment — Value as of January 1 of the current year
☐ Supplemental Assessment   TAX YEAR _____
   Attach 1 copy of Notice or Tax Bill
   Date of Notice or Tax Bill _____
☐ Roll Change/Escape Assessment/Calamity Reassessment   TAX YEAR _____
   Attach 1 copy of Notice or Tax Bill
   Date of Notice or Tax Bill _____

**6. THE FACTS THAT I RELY UPON TO SUPPORT REQUESTED CHANGES IN VALUE ARE AS FOLLOWS:** You may check all that apply. If you are uncertain of which item to check, please check "I. OTHER" and attach one copy of a brief explanation of your reason(s) for filing this application. PLEASE SEE INSTRUCTIONS BEFORE COMPLETING THIS SECTION.

☑ A. Decline in Value: The assessor's roll value exceeds the market value as of January 1 of the current year.
B. Change in Ownership:
☐ 1. No change in ownership or other reassessable event occurred on the date
☑ 2. Base year value for the change in ownership established on the date of 12-10-2007 is incorrect.
C. New Construction:
☐ 1. No new construction or other reassessable event occurred on the date of _____
☐ 2. Base year value for the new construction established on the date of _____ is incorrect.
☐ D. Calamity Reassessment: Assessor's reduced value is incorrect for property damaged by misfortune or calamity.

E. Personal Property/Fixtures: Assessor's value of personal property and/or fixtures exceeds market value.
☐ 1. All personal property/fixtures.
☐ 2. Only a portion of the personal property/fixtures. Attach description of those items.
☐ F. Penalty Assessment: Penalty assessment is not justified.
☐ G. Classification: Assessor's classification and/or allocation of value of property is incorrect.
H. Appeal after an Audit: MUST include description of each property, issues being appealed, and your opinion of value. Please refer to instructions.
☐ 1. Amount of escape assessment is incorrect.
☐ 2. Assessment of other property of the assessee at the location is incorrect.
☐ I. Other: Explain below or attach explanation.

**7. WRITTEN FINDINGS OF FACTS** ($256.00 per PARCEL) (DO NOT send with application).   ☐ Are requested   ☑ Are not requested

**8.** ☑ Yes   ☐ No   Do you want to designate this application as a claim for refund? Please refer to instructions first.

**CERTIFICATION**

I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing and all information hereon, including any accompanying statements or documents, is true, correct, and complete to the best of my knowledge and belief and that I am (1) the owner of the property or the person affected (i.e., a person having a direct economic interest in the payment of the taxes on that property—"The Applicant"), (2) an agent authorized by the applicant under item 2 of this application, or (3) an attorney licensed to practice law in the State of California, State Bar No. _____, who has been retained by the applicant and has been authorized by that person to file this application.

| SIGNATURE ☒  W. Scott Phinney | SIGNED AT  Lake Oswego | CITY | STATE  Oregon | DATE  12-1-08 |
|---|---|---|---|---|

NAME AND TITLE (please type or print)
W. Scott Phinney, Agent   ☐ Owner ☑ Agent   ☐ Attorney   ☐ Spouse   ☐ Registered Domestic Partner   ☐ Child   ☐ Parent   ☐ Person Affected

D.FIEGL-000712

08-24643

State of Oregon            )
                           )
County of Clackamas        )

N
O
T
A
R
Y

STAMP or SEAL

OFFICIAL SEAL
JANICE L BLAKESLEE
NOTARY PUBLIC-OREGON
COMMISSION NO. 405285
MY COMMISSION EXPIRES JULY 14, 2010

The attached Application For Changed Assessment, County of Riverside, State of California, was

acknowledged before me this 1st day of December, 2008, by W. Scott Phinney.

Janice L. Blakeslee

NOTARY:  Janice Blakeslee

My Commission Expires: 7-14-2010

D.FIEGL-000713

08 - 24643

## LIMITED POWER OF ATTORNEY
## AUTHORIZATION TO REPRESENT TAXPAYER
## AND/OR DISCLOSE INFORMATION

TO:   All County Assessment Offices
      Boards of Equalization
      Hearings Officers
      Assessment Appeals Boards
      Department of Revenue
      Other Administrative Bodies

*Van Buren Estates Partners, L.P.* authorizes and appoints W. Scott Phinney, to act as agent with full authority to handle all matters relating to real and personal property tax assessments and valuations. This includes, but is not limited to, filing of property tax appeals or other documents, examining any records which taxpayer would have a right to examine, appearing before any assessment officer, valuation board, hearings officer, Assessment Appeals Board, or State Board of Equalization and discussing assessments and resolving disputes concerning the assessments on the property before the reviewing body. This authorization is to take precedence over any pre-existing authorizations concerning the properties identified below.

Agent shall provide applicant with a copy of the application filed with the County.

Years Covered by Authorization:     2008-09

Property Address:                   NE Corner of Van Buren St. and 60th Ave., La Quinta, CA

County:                             Riverside

Assessor's Parcel Number(s):        759-090-001, 759-090-002, 759-090-003,
                                    759-080-008, and 759-080-011

By:  _Hen Skade_                    Date: _11/30/08_

     _HENRY SKADE_
     Print Name

     _MANAGER_                      File No. 08-924
     Title

D.FIEGL-000714

BOE-305-AH (S1) REV.8 (5/20/08)

**APPLICATION FOR CHANGED ASSESSMENT:** This form contains all the requests for information that are required for filing an application for Changed Assessment. Failure to complete this application may result in rejection of the application and/or denial of the appeal. Applicants should be prepared to submit additional information if requested by the Assessor or at the time of the

Appeals Document number: 200824644
Page 1 of 4
2/7/08 1:59 PM

**COUNTY OF RIVERSIDE - CLERK OF THE BOARD, P.O. BOX 1628, RIVERSIDE, CA. 92502-1628 (951) 955-1060**

APPLICATION # 2008 — 08-24644 (DO NOT WRITE IN THIS SPACE - FOR OFFICE USE ONLY)

| YEAR/ROLL | NSA DATE | DIV/OFFICE | USE CODE |
|---|---|---|---|
| 08 Reg | | | |

| INITIALS OF CLERK | DATE RECEIVED | TIMELY? |
|---|---|---|
| mrd | 12-1-08 | ☑ YES ☐ NO |

**1. APPLICANT'S NAME** (last, first, middle initial): Van Burien Estates Partners, L.P.

STREET ADDRESS/P.O. BOX NUMBER (MUST be applicant's mailing address): 100 Larkspur Landing Circle, Suite 199

CITY: Larkspur STATE: CA ZIP CODE: 94939

DAYTIME PHONE: (415) 461-2811 ALTERNATE PHONE: ( ) FAX NUMBER: ( )

E-MAIL ADDRESS:

**2. AGENT OR ATTORNEY FOR APPLICANT:** W. Scott Phinney

STREET ADDRESS/P.O. BOX NUMBER: P.O. Box 1708

CITY: Lake Oswego STATE: OR ZIP CODE: 97035

DAYTIME PHONE: (503) 635-4343 ALTERNATE PHONE: (503) 551-0888 FAX NUMBER: (503) 635-1526

E-MAIL ADDRESS: scotphin@aol.com

**AGENT'S AUTHORIZATION**

*If the applicant is a corporation, the agent's authorization must be signed by an officer or authorized employee of the business entity. If the agent is not an attorney licensed in California or a spouse, child, or parent of the person affected, the following must be completed (or attached to this application–see instructions).*

PRINT NAME OF AGENT AND AGENCY: W. Scott Phinney

*is hereby authorized to act as my agent in this application and may inspect assessor's records, enter into stipulations, and otherwise settle issues relating to this application.*

SIGNATURE OF APPLICANT/OFFICER/AUTHORIZED EMPLOYEE: See attached

TITLE: DATE:

**3. PROPERTY IDENTIFICATION INFORMATION – Please complete.**

ASSESSMENT, SUPPLEMENTAL, ESCAPE OR CORRECTED NUMBER (circle one): 759-090-002-6

PARCEL NUMBER (if different from above): ___-___-___-___

PROPERTY ADDRESS AND/OR LOCATION: 54000 Van Buren St, Thermal, CA

PROPERTY TYPE:
- ☐ Single-Family Residence/Condo/Townhouse
- ☐ Apartments (Number of Units ______)
- ☑ Commercial/Industrial
- ☑ Vacant Land
- ☑ Agricultural
- ☐ Other
- ☐ Business Personal Property/Fixtures

*Is this property an owner-occupied single-family dwelling?* ☐ Yes ☑ No

**4. VALUE**

| | A. VALUE ON ROLL | B. APPLICANT'S OPINION OF VALUE |
|---|---|---|
| LAND | 3424835 | 1800000 |
| IMPROVEMENT / STRUCTURES | 164380 | 0 |
| FIXTURES | | |
| BUS. / PERSONAL PROPERTY | | |
| TREES & VINES | | |
| MINERAL RIGHTS | | |
| PENALTIES | | |
| NET TOTAL | 3589215 | 1800000 |

**5. TYPE OF ASSESSMENT BEING APPEALED** (check one)
**IMPORTANT — SEE INSTRUCTIONS FOR FILING PERIODS**

- ☑ Regular Assessment — Value as of January 1 of the current year
- ☐ Supplemental Assessment — TAX YEAR ____
  Attach 1 copy of Notice or Tax Bill
  Date of Notice or Tax Bill ____
- ☐ Roll Change/Escape Assessment/Calamity Reassessment — TAX YEAR ____
  Attach 1 copy of Notice or Tax Bill
  Date of Notice or Tax Bill ____

**6. THE FACTS THAT I RELY UPON TO SUPPORT REQUESTED CHANGES IN VALUE ARE AS FOLLOWS** You may check all that apply. If you are uncertain of which item to check, please check "I. OTHER" and attach one copy of a brief explanation of your reason(s) for filing this application. PLEASE SEE INSTRUCTIONS BEFORE COMPLETING THIS SECTION

- ☑ A. Decline in Value: The assessor's roll value exceeds the market value as of January 1 of the current year.
- B. Change in Ownership:
  - ☐ 1. No change in ownership or other reassessable event occurred on the date of ____.
  - ☑ 2. Base year value for the change in ownership established on the date of 12-10-2007 is incorrect.
- C. New Construction:
  - ☐ 1. No new construction or other reassessable event occurred on the date of ____.
  - ☐ 2. Base year value for the new construction established on the date of ____ is incorrect.
- ☐ D. Calamity Reassessment: Assessor's reduced value is incorrect for property damaged by misfortune or calamity.
- E. Personal Property/Fixtures: Assessor's value of personal property and/or fixtures exceeds market value.
  - ☐ 1. All personal property/fixtures.
  - ☐ 2. Only a portion of the personal property/fixtures. Attach description of those items.
- ☐ F. Penalty Assessment: Penalty assessment is not justified.
- ☐ G. Classification: Assessor's classification and/or allocation of value of property is incorrect.
- H. Appeal after an Audit: MUST include description of each property, issues being appealed, and your opinion of value. Please refer to instructions.
  - ☐ 1. Amount of escape assessment is incorrect.
  - ☐ 2. Assessment of other property of the assessee at the location is incorrect.
- ☐ I. Other: Explain below or attach explanation.

RECEIVED RIVERSIDE COUNTY
2008 DEC -1 AM

**7. WRITTEN FINDINGS OF FACTS** ($256.00 per PARCEL) *(DO NOT send with application).* ☐ Are requested ☑ Are not requested

**8.** ☑ Yes ☐ No Do you want to designate this application as a claim for refund? *Please refer to instructions first.*

**CERTIFICATION**

*I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing and all information hereon, including any accompanying statements or documents, is true, correct, and complete to the best of my knowledge and belief and that I am (1) the owner of the property or the person affected (i.e., a person having a direct economic interest in the payment of the taxes on that property—"The Applicant"), (2) an agent authorized by the applicant under Item 2 of this application, or (3) an attorney licensed to practice law in the State of California, State Bar No. ______, who has been retained by the applicant and has been authorized by that person to file this application*

SIGNATURE: [signature] SIGNED AT CITY: Lake Oswego STATE: Oregon DATE: 12-1-08

NAME AND TITLE (please type or print): W. Scott Phinney, Agent ☐ Owner ☑ Agent ☐ Attorney ☐ Spouse ☐ Registered Domestic Partner ☐ Child ☐ Parent ☐ Person Affected

36

08 - 2 4 6 4 4

State of Oregon )
)
County of Clackamas )

N
O
T
A
R
Y

OFFICIAL SEAL
JANICE L BLAKESLEE
NOTARY PUBLIC-OREGON
COMMISSION NO. 405205
MY COMMISSION EXPIRES JULY 14, 2010

S T A M P  or  S E A L

The attached Application For Changed Assessment, County of Riverside, State of California, was acknowledged before me this 1st day of December, 2008, by W. Scott Phinney.

*Janice L. Blakeslee*

NOTARY:  Janice Blakeslee

My Commission Expires: 7-14-2010

D.FIEGL-000716

08 - 2 4 6 4 4

## LIMITED POWER OF ATTORNEY
### AUTHORIZATION TO REPRESENT TAXPAYER
### AND/OR DISCLOSE INFORMATION

TO:   All County Assessment Offices
      Boards of Equalization
      Hearings Officers
      Assessment Appeals Boards
      Department of Revenue
      Other Administrative Bodies

*Van Buren Estates Partners, L.P.* authorizes and appoints W. Scott Phinney, to act as agent with full authority to handle all matters relating to real and personal property tax assessments and valuations. This includes, but is not limited to, filing of property tax appeals or other documents, examining any records which taxpayer would have a right to examine, appearing before any assessment officer, valuation board, hearings officer, Assessment Appeals Board, or State Board of Equalization and discussing assessments and resolving disputes concerning the assessments on the property before the reviewing body. This authorization is to take precedence over any pre-existing authorizations concerning the properties identified below.

Agent shall provide applicant with a copy of the application filed with the County.

Years Covered by Authorization:      2008-09

Property Address:                    NE Corner of Van Buren St. and 60th Ave., La Quinta, CA

County:                              Riverside

Assessor's Parcel Number(s):         759-090-001, 759-090-002, 759-090-003,
                                     759-080-008, and 759-080-011

By: _Hery Skade_                Date: _11/30/08_

_HENRY SKADE_
Print Name

_MANAGER_                       File No. 08-924
Title

D.FIEGL-000717

BOE-305-AH (S1) REV.8 (5/20/08)
**APPLICATION FOR CHANGED ASSESSMENT:** This form contains all the requests for information that are required for filing an application for Changed Assessment. Failure to complete this application may result in rejection of the application and/or denial of the appeal. Applicants should be prepared to submit additional information if requested by the Assessor or at the time of the hearing. Failure to provide information the Appeals Board considers necessary may result in the continuance of the hearing.
PLEASE TYPE OR PRINT IN DARK INK. SEE INSTRUCTIONS FOR FURTHER INFORMATION.

**COUNTY OF RIVERSIDE - CLERK OF THE BOARD, P.O. BOX 1628, RIVERSIDE, CA. 92502-1628 (951) 955-1060**

**APPLICATION # 2008** DO NOT WRITE IN THIS SPACE - FOR OFFICE USE ONLY

08-24640

| YEAR/ROLL | NSA DATE | DIV/OFFICE | USE CODE |
|---|---|---|---|
| 08 Reg | | | |

| INITIALS OF CLERK | DATE RECEIVED | TIMELY? ☐ YES ☐ NO |
|---|---|---|
| mg | 12-1-08 | |

**1. APPLICANT'S NAME** (last, first, middle initial)
Van Buren Estates Partners, L.P.

**STREET ADDRESS/P.O. BOX NUMBER** (MUST be applicant's mailing address)
100 Larkspur Landing Circle, Suite 199

| CITY | STATE | ZIP CODE |
|---|---|---|
| Larkspur | CA | 94939 |

| DAYTIME PHONE | ALTERNATE PHONE | FAX NUMBER |
|---|---|---|
| (415) 461-2811 | ( ) | ( ) |

**E-MAIL ADDRESS**

**2. AGENT OR ATTORNEY FOR APPLICANT**
W. Scott Phinney

**STREET ADDRESS/P.O. BOX NUMBER**
P.O. Box 1708

| CITY | STATE | ZIP CODE |
|---|---|---|
| Lake Oswego | OR | 97035 |

| DAYTIME PHONE | ALTERNATE PHONE | FAX NUMBER |
|---|---|---|
| (503) 636-9343 | (503) 551-0888 | (503) 635-1526 |

**E-MAIL ADDRESS**
scotphin@aol.com

**AGENT'S AUTHORIZATION**

If the applicant is a corporation, the agent's authorization must be signed by an officer or authorized employee of the business entity. If the agent is not an attorney licensed in California or a spouse, child, or parent of the person affected, the following must be completed (or attached to this application–see instructions).

**PRINT NAME OF AGENT AND AGENCY**
W. Scott Phinney

is hereby authorized to act as my agent in this application and may inspect assessor's records, enter into stipulations, and otherwise settle issues relating to this application.

**SIGNATURE OF APPLICANT/OFFICER/AUTHORIZED EMPLOYEE**
See attached

| TITLE | DATE |
|---|---|
| | |

**3. PROPERTY IDENTIFICATION INFORMATION** – Please complete

**ASSESSMENT, SUPPLEMENTAL, ESCAPE OR CORRECTED NUMBER** (circle one)
759-080-005-1

**PARCEL NUMBER** (If different from above)

**PROPERTY ADDRESS AND/OR LOCATION**
Nw Corner Van Buren + 60th Avenue, CA

**PROPERTY TYPE:**
☐ Single-Family Residence/Condo/Townhouse
☐ Apartments (Number of Units ___ )
☑ Commercial/Industrial ☑ Vacant Land
☐ Agricultural ☐ Other ___
☐ Business Personal Property/Fixtures
Is this property an owner-occupied single-family dwelling? ☐ Yes ☑ No

**4. VALUE**

| | A. VALUE ON ROLL | B. APPLICANT'S OPINION OF VALUE |
|---|---|---|
| LAND | 1835011 | 1535500 |
| IMPROVEMENT / STRUCTURES | | |
| FIXTURES | | |
| BUS. / PERSONAL PROPERTY | | |
| TREES & VINES | | |
| MINERAL RIGHTS | | |
| PENALTIES | | |
| NET TOTAL | 1835011 | 1535500 |

**5. TYPE OF ASSESSMENT BEING APPEALED** (check one)
IMPORTANT — SEE INSTRUCTIONS FOR FILING PERIODS
☑ Regular Assessment — Value as of January 1 of the current year
☐ Supplemental Assessment    TAX YEAR
   Attach 1 copy of Notice or Tax Bill
   Date of Notice or Tax Bill ___
☐ Roll Change/Escape Assessment/Calamity Reassessment    TAX YEAR
   Attach 1 copy of Notice or Tax Bill
   Date of Notice or Tax Bill ___

**6. THE FACTS THAT I RELY UPON TO SUPPORT REQUESTED CHANGES IN VALUE ARE AS FOLLOWS:** You may check all that apply. If you are uncertain of which item to check, please check "I OTHER" and attach one copy of a brief explanation of your reason(s) for filing this application. PLEASE SEE INSTRUCTIONS BEFORE COMPLETING THIS SECTION.

☑ A. Decline in Value: The assessor's roll value exceeds the market value as of January 1 of the current year.
☐ B. Change in Ownership:
  ☐ 1. No change in ownership or other reassessable event occurred on the date of ___
  ☑ 2. Base year value for the change in ownership established on the date of 12-10-2007 is incorrect.
☐ C. New Construction:
  ☐ 1. No new construction or other reassessable event occurred on the date of ___
  ☐ 2. Base year value for the new construction established on the date of ___ is incorrect.
☐ D. Calamity Reassessment: Assessor's reduced value is incorrect for property damaged by misfortune or calamity.

☐ E. Personal Property/Fixtures: Assessor's value of personal property and/or fixtures exceeds market value.
  ☐ 1. All personal property/fixtures.
  ☐ 2. Only a portion of the personal property/fixtures. Attach description of those items.
☐ F. Penalty Assessment: Penalty assessment is not justified.
☐ G. Classification: Assessor's classification and/or allocation of value of property is incorrect.
☐ H. Change after an Audit: MUST include description of each property/issues being appealed, and your opinion of value. Please refer to instructions.
  ☐ 1. Amount of escape assessment is incorrect.
  ☐ 2. Assessment of other property of the assessee at the location is incorrect.
☐ I. Other: Explain below or attach explanation.

**7. WRITTEN FINDINGS OF FACTS** ($256.00 per PARCEL) (DO NOT send with application). ☐ Are requested ☑ Are not requested

**8.** ☑ Yes ☐ No Do you want to designate this application as a claim for refund? Please refer to instructions first.

**CERTIFICATION**

I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing and all information hereon, including any accompanying statements or documents, is true, correct, and complete to the best of my knowledge and belief and that I am (1) the owner of the property or the person affected (i.e., a person having a direct economic interest in the payment of the taxes on that property–"The Applicant"), (2) an agent authorized by the applicant under item 2 of this application, or (3) an attorney licensed to practice law in the State of California. State Bar No. ___, who has been retained by the applicant and has been authorized by that person to file this application

| SIGNATURE | SIGNED AT: CITY | STATE | DATE |
|---|---|---|---|
| W. Scott Phinney | Lake Oswego | Oregon | 12-1-08 |

**NAME AND TITLE** (please type or print)
W. Scott Phinney, Agent ☑ Owner ☑ Agent ☐ Attorney ☐ Spouse ☐ Registered Domestic Partner ☐ Child ☐ Parent ☐ Person Affected

D.FIEGL-000718

08 - 24646

State of Oregon                    )
                                   )
County of Clackamas                )

N
O
T
A
R
Y

OFFICIAL SEAL
JANICE L BLAKESLEE
NOTARY PUBLIC-OREGON
COMMISSION NO. 406295
MY COMMISSION EXPIRES JULY 14, 2010

STAMP or SEAL

The attached Application For Changed Assessment, County of Riverside, State of California, was

acknowledged before me this 1st day of December, 2008, by W. Scott Phinney.

NOTARY:  Janice Blakeslee

My Commission Expires: 7-14-2010

D.FIEGL-000719

08 - 2 4 6 4 6

## LIMITED POWER OF ATTORNEY
## AUTHORIZATION TO REPRESENT TAXPAYER
## AND/OR DISCLOSE INFORMATION

TO:   All County Assessment Offices
       Boards of Equalization
       Hearings Officers
       Assessment Appeals Boards
       Department of Revenue
       Other Administrative Bodies

*Van Buren Estates Partners, L.P.* authorizes and appoints W. Scott Phinney, to act as agent with full authority to handle all matters relating to real and personal property tax assessments and valuations. This includes, but is not limited to, filing of property tax appeals or other documents, examining any records which taxpayer would have a right to examine, appearing before any assessment officer, valuation board, hearings officer, Assessment Appeals Board, or State Board of Equalization and discussing assessments and resolving disputes concerning the assessments on the property before the reviewing body. This authorization is to take precedence over any pre-existing authorizations concerning the properties identified below.

Agent shall provide applicant with a copy of the application filed with the County.

Years Covered by Authorization:     2008-09

Property Address:                   NE Corner of Van Buren St. and 60th Ave., La Quinta, CA

County:                             Riverside

Assessor's Parcel Number(s):        759-090-001, 759-090-002, 759-090-003,
                                    759-080-008, and 759-080-011

By: _Hen Skade_                     Date: _11/30/08_

_HENRY SKADE_
Print Name

_MANAGER_
Title                               File No. 08-924

D.FIEGL-000720

BOE-305-AH (S1) REV.8 (5/20/08)

**APPLICATION FOR CHANGED ASSESSMENT:** This form contains all the requests for information that are required for filing an application for Changed Assessment. Failure to complete this application may result in rejection of the application and/or denial of the appeal. Applicants should be prepared to ~~support... the basis of the...~~

Appeals / Document number: 200024647
Page 1 of
2/8/08 1:59 PM

**COUNTY OF RIVERSIDE - CLERK OF THE BOARD, P.O. BOX 1628.**
**RIVERSIDE, CA. 92502-1628   (951) 955-1060**

**APPLICATION # 2008**

DO NOT WRITE IN THIS SPACE - FOR OFFICE USE ONLY

**08 - 24647**

| YEAR/ROLL | NSA DATE | DIV/OFFICE | USE CODE |
|---|---|---|---|
| 08 Roll | | | |
| INITIALS OF CLERK | | DATE RECEIVED | TIMELY? ☐ YES ☐ NO |
| MA | | 12-1-08 | |

**1. APPLICANT'S NAME** (last, first, middle initial)

Van Burien Estates Partners, L.P.

STREET ADDRESS/P.O. BOX NUMBER (MUST be applicant's mailing address)
100 Larkspur Landing Circle, Suite 199

| CITY | STATE | ZIP CODE |
|---|---|---|
| Larkspur | CA | 94939 |

| DAYTIME PHONE | ALTERNATE PHONE | FAX NUMBER |
|---|---|---|
| (415) 461-2811 | ( ) | ( ) |

E-MAIL ADDRESS

**2. AGENT OR ATTORNEY FOR APPLICANT**

W. Scott Phinney

STREET ADDRESS/P.O. BOX NUMBER
P.O. Box 1708

| CITY | STATE | ZIP CODE |
|---|---|---|
| Lake Oswego | OR | 97035 |

| DAYTIME PHONE | ALTERNATE PHONE | FAX NUMBER |
|---|---|---|
| (503) 635-9393 | (503) 657-0865 | (503) 635-1526 |

E-MAIL ADDRESS
scotphin@aol.com

**AGENT'S AUTHORIZATION**

If the applicant is a corporation, the agent's authorization must be signed by an officer or authorized employee of the business entity. If the agent is not an attorney licensed in California or a spouse, child, or parent of the person affected, the following must be completed (or attached to this application—see instructions).

PRINT NAME OF AGENT AND AGENCY

W. Scott Phinney

is hereby authorized to act as my agent in this application and may inspect assessor's records, enter into stipulations, and otherwise settle issues relating to this application.

SIGNATURE OF APPLICANT/OFFICER/AUTHORIZED EMPLOYEE
X   see attached

| TITLE | DATE |
|---|---|

**3. PROPERTY IDENTIFICATION INFORMATION** – Please complete.

ASSESSMENT, SUPPLEMENTAL, ESCAPE OR CORRECTED NUMBER (circle one)

759.080&011.3

PARCEL NUMBER (if different from above)

PROPERTY ADDRESS AND/OR LOCATION
59010 Van Buren St. Thermal, CA

**PROPERTY TYPE:**
☐ Single-Family Residence/Condo/Townhouse
☐ Apartments (Number of Units _____)
☑ Commercial/Industrial   ☑ Vacant Land
☑ Agricultural   ☐ Other _____
☐ Business Personal Property/Fixtures
Is this property an owner-occupied single-family dwelling?   ☐ Yes   ☑ No

**4. VALUE**

| | A. VALUE ON ROLL | B. APPLICANT'S OPINION OF VALUE |
|---|---|---|
| LAND | 1,669,979 | 900,000 |
| IMPROVEMENT / STRUCTURES | 218,900 | |
| FIXTURES | | |
| BUS. / PERSONAL PROPERTY | | |
| TREES & VINES | | |
| MINERAL RIGHTS | | |
| PENALTIES | | |
| NET TOTAL | 2,288,879 | 900,000 |

**5. TYPE OF ASSESSMENT BEING APPEALED** (check one)
**IMPORTANT — SEE INSTRUCTIONS FOR FILING PERIODS**
☑ Regular Assessment — Value as of January 1 of the current year
☐ Supplemental Assessment
　Attach 1 copy of Notice or Tax Bill
　Date of Notice or Tax Bill _____   TAX YEAR _____
☐ Roll Change/Escape Assessment/Calamity Reassessment
　Attach 1 copy of Notice or Tax Bill
　Date of Notice or Tax Bill _____   TAX YEAR _____

**6. THE FACTS THAT I RELY UPON TO SUPPORT REQUESTED CHANGES IN VALUE ARE AS FOLLOWS:** You may check all that apply. If you are uncertain of which item to check, please check "OTHER" and attach one copy of a brief explanation of your reason(s) for filing this application. PLEASE SEE INSTRUCTIONS BEFORE COMPLETING THIS SECTION

☑ A. **Decline in Value:** The assessor's roll value exceeds the market value as of January 1 of the current year.

B. **Change in Ownership:**
　☐ 1. No change in ownership or other reassessable event occurred on the date of _____
　☑ 2. Base year value for the change in ownership established on the date of 12-10-2007 is incorrect.

C. **New Construction:**
　☐ 1. No new construction or other reassessable event occurred on the date of _____
　☐ 2. Base year value for the new construction established on the date of _____ is incorrect.

☐ D. **Calamity Reassessment:** Assessor's reduced value is incorrect for property damaged by misfortune or calamity.

E. **Personal Property/Fixtures:** Assessor's value of personal property and/or fixtures exceeds market value.
　☐ 1. All personal property/fixtures.
　☐ 2. Only a portion of the personal property/fixtures. Attach description of those items.

☐ F. **Penalty Assessment:** Penalty assessment is not justified.

☐ G. **Classification:** Assessor's classification and/or allocation of value of property is incorrect.

H. **Appeal after an Audit:** MUST include description of each property issues being appealed, and your opinion of value. Please refer to instructions.
　☐ 1. Amount of escape assessment is incorrect
　☐ 2. Assessment of other property of the assessee at the location is incorrect.

☐ I. **Other:** Explain below or attach explanation

**7. WRITTEN FINDINGS OF FACTS** ($256.00 per PARCEL) (DO NOT send with application).   ☐ Are requested   ☑ Are not requested

**8.** ☑ Yes   ☐ No   Do you want to designate this application as a claim for refund? Please refer to instructions first.

**CERTIFICATION**

I certify (or declare) under penalty of perjury under the laws of the State of California that the foregoing and all information hereon, including any accompanying statements or documents, is true, correct, and complete to the best of my knowledge and belief and that I am (1) the owner of the property or the person affected (i.e., a person having a direct economic interest in the payment of the taxes on that property—"The Applicant"), (2) an agent authorized by the applicant under item 2 of this application or (3) an attorney licensed to practice law in the State of California, State Bar No _____ who has been retained by the applicant and has been authorized by that person to file this application.

| SIGNATURE | | CITY | STATE | DATE |
|---|---|---|---|---|
| W. Scott Phinney | | Lake Oswego | Oregon | 12-1-08 |

NAME AND TITLE (please type or print)
W. Scott Phinney, Agent

☐ Owner   ☑ Agent   ☐ Attorney   ☐ Spouse   ☐ Registered Domestic Partner   ☐ Child   ☐ Parent   ☐ Person Affected

08 - 2 4 6 4 7

State of Oregon )

County of Clackamas )

N
O
T
A
R
Y

OFFICIAL SEAL
JANICE L BLAKESLEE
NOTARY PUBLIC-OREGON
COMMISSION NO. 406295
MY COMMISSION EXPIRES JULY 14, 2010

· S T A M P or S E A L

The attached Application For Changed Assessment, County of Riverside, State of California, was

acknowledged before me this 1st day of December, 2008, by W. Scott Phinney.

_Janice L. Blakeslee_

NOTARY:  Janice Blakeslee

My Commission Expires: _7-14-2010_

D.FIEGL-000722

08 - 2 4 6 4 7

## LIMITED POWER OF ATTORNEY
## AUTHORIZATION TO REPRESENT TAXPAYER
## AND/OR DISCLOSE INFORMATION

TO:     All County Assessment Offices
        Boards of Equalization
        Hearings Officers
        Assessment Appeals Boards
        Department of Revenue
        Other Administrative Bodies

*Van Buren Estates Partners, L.P.* authorizes and appoints W. Scott Phinney, to act as agent with full authority to handle all matters relating to real and personal property tax assessments and valuations. This includes, but is not limited to, filing of property tax appeals or other documents, examining any records which taxpayer would have a right to examine, appearing before any assessment officer, valuation board, hearings officer, Assessment Appeals Board, or State Board of Equalization and discussing assessments and resolving disputes concerning the assessments on the property before the reviewing body. This authorization is to take precedence over any pre-existing authorizations concerning the properties identified below.

Agent shall provide applicant with a copy of the application filed with the County.

Years Covered by Authorization:        2008-09

Property Address:                      NE Corner of Van Buren St. and 60th Ave., La Quinta, CA

County:                                Riverside

Assessor's Parcel Number(s):           759-090-001, 759-090-002, 759-090-003,
                                       759-080-008, and 759-080-011

By: _Hen Skade_                        Date: _11/30/08_

_HENRY SKADE_
Print Name

_MANAGER_                              File No. 08-924
Title

D.FIEGL-000723

**DOZIER'S $16.3M APPRAISAL 12/1/09**                    **EXHIBIT 16**

D.FIEGL-000724

SUMMARY REPORT FORMAT

"AS IS" MARKET VALUE IN LEASE FEE ESTATE
OF

**163.87 ACRES OF VACANT LAND WITH
APPROVED TENTATIVE TRACT MAP # 34556 FOR 301 RESIDENTIAL LOTS
LOCATED ON THE
NORTHEAST CORNER OF AVENUE 60 AND VAN BUREN STREET
IN
THERMAL, CA 92274
APN: 759-090-001, 002, 003 & 759-080-008, 011
RIVERSIDE COUNTY, CA**

**EFFECTIVE DATE OF THE APPRAISAL**

NOVEMBER 30, 2009

**DATE OF THE REPORT**

DECEMBER 1, 2009

**DOZIER FILE NUMBER L-09-135-LB**

PREPARED FOR

**MR. TOM LODATO
846 PORTOLA ROAD, SUITE J
PORTOLA VALLEY, CALIFORNIA 94028**

**BY**

**Raymond L. Dozier, MAI
DOZIER APPRAISAL COMPANY
PALM DESERT, CA  92260**

D.FIEGL-000725

# DOZIER APPRAISAL COMPANY
### Resort and Urban Property Appraisers
### Valuation and Financial Consultants

73-350 EL PASEO, SUITE 206
PALM DESERT, CALIFORNIA 92260

RAYMOND L. DOZIER, MAI
CERTIFIED GENERAL APPRAISER
LICENSE # AG004590

TEL. (760) 776-4200
FAX (760) 776-4977
E-MAIL Dozierappraisal@dc.rr.com

December 1, 2009

Mr. Tom Lodato
846 Portola Road, Suite J
Portola Valley, California 94028

RE:   *"As Is" Market Value Appraisal of 163.87 Gross acres of vacant land with approved tentative tract map for 301 residential lots located on the Northeast Corner of Avenue 60 and Van Buren Street in Thermal, California 92274.*

Mr. Lodato:

Enclosed is an appraisal I have made of the "As Is" Market Value of the Real Property Interest of 163.87 Gross acres of vacant land with approved tentative tract map for 301 residential lots located on the Northeast Corner of Avenue 60 and Van Buren Street in Thermal, California 92274.  This appraisal was made at the request and agreement between Mr. Tom Lodato and Dozier Appraisal Company.  This report is intended for use only by Mr. Tom Lodato.  Use of this report by others is not intended by the appraiser.

The purpose of this appraisal is to estimate and report my opinion of the "As Is" MARKET VALUE of the subject's REAL PROPERTY INTEREST in 163.87 Gross acres of vacant land with approved tentative tract map for 301 residential lots as if sold to a single purchaser as of the appraiser's date of viewing November 30, 2009 .  In the "As Is" scenario, the property will be appraised a whatever stage of development (entitlement) as of the effective date of the appraisal, November 30, 2009.   All elements of a MARKET VALUE sale are to be present in terms of the price upon which a willing and well-informed seller and a willing and well-informed buyer would agree, in the absence of any unusual compulsion on either, and reasonable exposure on the open and competitive market.  Reasonable exposure time in MARKET VALUE estimates precedes the specified date (effective date) of the appraisal.  MARKET VALUE also assumes an open and competitive market of the property interest being appraised.  The use of the appraisal is to establishing collateral or possible financing.

The property rights appraised establish the LEASE FEE Interest of all future benefits that may be derived from the property's present or possible use, except for existing easements, rights-of-way of record and existing lease.

*Dozier Appraisal Company*
*Palm Desert, California*

D.FIEGL-000726

Page 3 of 3
Mr. Tom Lodato

To make this appraisal, Raymond L. Dozier, MAI, has made a personal viewing of the subject property. He has reviewed sales of comparable properties and has weighed and compared this data to arrive at his estimate of value for the subject property. The effective date of this valuation is November 30, 2009.

This report is subject to the enclosed Assumptions and Limiting Conditions and the Certification of Value and The Scope and Extent of the Data Collection Process on this report.

The appraisal is making the following extraordinary assumptions, hypothetical conditions, or major highest and best conclusions:

- The subject property has an approved tentative tract map which subdivides the property into 301 residential lots. Conversations with the County of Riverside planning department indicated that it would take approximately 12 months to complete the entitlement process and obtain final tract map approval. (Highest and Best Use Conclusion)

- There is a reasonable probability that Avenue 59 will never extend through any portion of the subject property and any development of this roadway has effectively been abandoned by the County of Riverside. (Highest and Best Use Conclusion).

- The subject property is currently improved with a working horse ranch. The highest and best use analysis indicated that any income derived from the current lease on the subject property's horse ranch, will be off-set by the cost of demolition leaving no contributory value of the current improvements. (Highest and Best Use Conclusion).

Otherwise there are no extraordinary or special assumptions regarding this appraisal. Also, this letter of transmittal is not the completed appraisal report but a statement of value conclusions. Users of this appraisal are encouraged to read the completed attached report to reach the appraiser's conclusions via the appraisal process.

This letter of transmittal is not the complete appraisal report but a statement of value conclusions. Users of the appraisal are encouraged to read the completed attached report to reach appraiser's conclusions via the appraisal process.

The intention of this appraisal report is to comply fully with FIRREA appraisal guidelines, as well as the current Uniform Standards of Professional Appraisal practice (USPAP) adopted by the Appraisal Standards Board of the Appraisal Foundation; and the requirements of the Code of Professional Ethics and Standards of Professional Practice of the Appraisal Institute. The departure provision in USPAP shall not apply to this appraisal.

The undersigned does not have any personal interest, either present or contemplated, in the subject property and certifies that fees, received or to be received, for the employment of my services are not contingent on the opinions reported herein. In addition, the undersigned meets the Competency Provision Standard (1.1a,b,c) as required by USPAP and has the knowledge and experience to complete the assignment competently.

*Dozier Appraisal Company*
*Palm Desert, California*

D.FIEGL-000727

Page 3 of 3
Mr. Tom Lodato

Therefore, based upon my investigation and analysis of the data gathered with respect to this assignment, I have formed the opinion that "As Is" Market Value (Partially Entitled) of the Lease Fee interest in the subject's 163.87 Gross acres of land, as of the effective date November 30, 2009, is measured in the amount of:

$16,300,000[1] ($54,153/paper lot or $99,469/Gross Acre) [2]

**(SIXTEEN MILLION THREE HUNDRED THOUSAND DOLLARS)**

Reasonable exposure time necessary to sell this property to a single purchaser prior to the date of this appraisal is estimated 10 to 12 months.

Respectfully submitted,
DOZIER APPRAISAL COMPANY

Raymond L. Dozier, MAI
State Certified General Real Estate Appraiser
CA. Cert. No. AG004590
RLD/lhp (Word\L-09-135-LB_163.87 Gross AC of Land_Thermal.doc)

---

[1] The reader will note that the appraiser estimated a marketing time of 10 to 12 months after the date of this appraisal. Consequently, due to current negative market conditions, if the property must be sold prior to this 10 to 12 month marketing period after the date of this appraisal, the sales price would be considered a liquidation value which could be significantly less than the appraised market value.

[2] Above values are based on hypothetical conditions, extra ordinary assumptions, and/or major highest and best use conclusions found in the letter of transmittal. If any of these hypothetical conditions, extraordinary assumptions, and/or major highest and best use conclusions prove to be false; the estimated values could be highly impacted.

*Dozier Appraisal Company*
*Palm Desert, California*

D.FIEGL-000728

**DEPO TOM LODATO taken 5/17/11 in Stewart Title litigation        EXHIBIT 17**

D.FIEGL-000729

SUPERIOR COURT OF THE STATE OF CALIFORNIA

IN AND FOR THE COUNTY OF RIVERSIDE - INDIO DIVISION

VAN BUREN ESTATES, LLC, a
Limited Liability Company; VAN
BUREN ESTATES II, LLC, a
Limited Liability Company; VAN
BUREN ESTATES PARTNERS, LP, a
California Limited Partnership,

       Plaintiffs,

   vs.                   Case No. INC 10002614

STEWART TITLE OF CALIFORNIA,
INC., a Corporation;
STEWART TITLE GUARANTY COMPANY,
a Corporation, and
DOES 1 through 20,

       Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF PERSON MOST KNOWLEDGEABLE OF VAN BUREN

THOMAS LODATO

MAY 17, 2011

9:35 a.m.

555 California Street, Suite 2000
San Francisco, California

Rebecca L. Romano, CSR-12546



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

D.FIEGL-000730

Thomas Lodato                                    May 17, 2011

60

1           THE DEPONENT:  Yes.

2           MR. RICE:  Thank you.

3           THE DEPONENT:  Uh-huh.

4           MR. RICE:  Personal knowledge, if you had an

5      opinion.

6           THE DEPONENT:  At the time I received this

7      appraisal, Exhibit 5, dated December 1st, 2009, I was

8      surprised the value was as high as it indicates in

9      here.

10          I, based on my knowledge at the time of what

11     properties were selling for, would have thought it

12     would be two-thirds or less of this figure.

13          Q.   (By Mr. Lin)  So your opinion is it would

14     have been two-thirds or less of $16,300,000?

15          A.   Correct.

16          Q.   Okay.  In your dealings with Stewart Title of

17     California relating to the Van Buren property, did you

18     from time to time request preliminary reports?

19          A.   Yes.

20          Q.   Okay.  And who did you talk to to request

21     preliminary reports?

22          A.   Well, it was usually Patty McHugh.

23          Q.   Did you talk to anyone else to request

24     preliminary reports?

25          A.   Sometimes I would -- I would get one of her



ESQUIRE
an Alexander Gallo Company

Toll Free: 877.342.5600
Facsimile: 310.286.0276

Suite 500
1875 Century Park East
Los Angeles, CA 90067
www.esquiresolutions.com

D.FIEGL-000731

**PENAL CODE SECTIONS 484 and 532a**                    **EXHIBIT 18**

D.FIEGL-000732

**California Penal Code:**

**484.**  (a) Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property, or who causes or procures others to report falsely of his or her wealth or mercantile character and by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains possession of money, or property or obtains the labor or service of another, is guilty of theft. In determining the value of the property obtained, for the purposes of this section, the reasonable and fair market value shall be the test, and in determining the value of services received the contract price shall be the test. If there be no contract price, the reasonable and going wage for the service rendered shall govern. For the purposes of this section, any false or fraudulent representation or pretense made shall be treated as continuing, so as to cover any money, property or service received as a result thereof, and the complaint, information or indictment may charge that the crime was committed on any date during the particular period in question. The hiring of any additional employee or employees without advising each of them of every labor claim due and unpaid and every judgment that the employer has been unable to meet shall be prima facie evidence of intent to defraud.

**California Penal Code:**

**532a.**  (1) Any person who shall knowingly make or cause to be made, either directly or indirectly or through any agency whatsoever, any false statement in writing, with intent that it shall be relied upon, respecting the financial condition, or means or ability to pay, of himself or herself, or any other person, firm or corporation, in whom he or she is interested, or for whom he or she is acting, for the purpose of procuring in any form whatsoever, either the delivery of personal property, the payment of cash, the making of a loan or credit, the extension of a credit, the execution of a contract of guaranty or suretyship, the discount of an account receivable, or the making, acceptance, discount, sale or endorsement of a bill of exchange, or promissory note, for the benefit of either himself or herself or of that person, firm or corporation shall be guilty of a public offense.

D.FIEGL-000733

(Penal Code section 532a continued)

(2) Any person who knowing that a false statement in writing has been made, respecting the financial condition or means or ability to pay, of himself or herself, or a person, firm or corporation in which he or she is interested, or for whom he or she is acting, procures, upon the faith thereof, for the benefit either of himself or herself, or of that person, firm or corporation, either or any of the things of benefit mentioned in the first subdivision of this section shall be guilty of a public offense.

(3) Any person who knowing that a statement in writing has been made, respecting the financial condition or means or ability to pay of himself or herself or a person, firm or corporation, in which he or she is interested, or for whom he or she is acting, represents on a later day in writing that the statement theretofore made, if then again made on said day, would be then true, when in fact, said statement if then made would be false, and procures upon the faith thereof, for the benefit either of himself or herself or of that person, firm or corporation either or any of the things of benefit mentioned in the first subdivision of this section shall be guilty of a public offense.

(4) Any person committing a public offense under subdivision (1), (2), or (3) shall be guilty of a misdemeanor, punishable by a fine of not more than one thousand dollars ($1,000), or by imprisonment in the county jail for not more than six months, or by both that fine and imprisonment. Any person who violates the provisions of subdivision (1), (2), or (3), by using a fictitious name, social security number, business name, or business address, or by falsely representing himself or herself to be another person or another business, is guilty of a felony and is punishable by a fine not exceeding five thousand dollars ($5,000) or by imprisonment pursuant to subdivision (h) of Section 1170, or by both that fine and imprisonment, or by a fine not exceeding two thousand five hundred dollars ($2,500) or by imprisonment in the county jail not exceeding one year, or by both such fine and imprisonment.

(5) This section shall not be construed to preclude the applicability of any other provision of the criminal law of this state which applies or may apply to any transaction.

**WARREN & ASSOCIATES APPRAISAL done JULY 2010**          **EXHIBIT 19**

D.FIEGL-000735



WARREN & ASSOCIATES, INC.
REAL ESTATE APPRAISERS AND CONSULTANTS

COMMERCIAL

July 12, 2010

Mr. George Fiegl
GF Ventures
401 National Avenue
Mountain View, California 94043

**RE:** **APPRAISAL OF THE VAN BUREN ESTATES, A PROPOSED 301 LOT RESIDENTIAL SUBDIVISION, LOCATED IN AN UNINCORPORATED COMMUNITY OF RIVERSIDE COUNTY NEAR THE CITIES OF COACHELLA AND LA QUINTA, CALIFORNIA 92274**

Dear Mr. Fiegl:

At your request, we have inspected and appraised the above-referenced property. The purpose of this appraisal is to estimate the following values:

- Market Value "as-is";
- Prospective Market Value of 301 Lots at Completion, and
- Retrospective Value of the Subject Parcels, as of December, 2007.

The appraised values are subject to the definition of market value, the assumptions and limiting conditions and the certification contained in the attached report. The interest appraised are those of the fee simple estate.

The subject property is part of The Van Buren Estates, a proposed residential subdivision located in an unincorporated area of Riverside County near the cities of Coachella and La Quinta, California. Van Buren Estates is proposed to include 301 detached single-family homes situated on lots ranging in size from 10,000 to 17,116 square feet.

976 Main Street, Suite B Ramona, California 92065· Phone: 760 788-1048 Fax: 760 788-0425

Mr. George Fiegl
GF Ventures
July 12, 2010
Page Two

*The subject property includes $37,717.29 of delinquent taxes/fees and penalties, according to the Riverside County Treasurer-Tax Collector. The value conclusion of this appraisal assumes payment of all delinquent taxes/fees by the seller.*

This appraisal has been developed in conformance with our interpretation of the Code of Professional Ethics and Standards of Professional Practice set forth by the Appraisal Institute and all binding requirements of the Uniform Standards of Professional Appraisal Practice (USPAP) adopted by the Appraisal Foundation, the appraisal standards for the Federal Deposit Insurance Corporation (FDIC), Office of the Controller of the Currency (OCC), the Office of Thrift Supervision (OTS), and the appraisal requirements of GF Ventures.

This is a self-Contained appraisal report, which is intended to comply with the reporting requirements set forth under Standards Rule 2-2(A) of USPAP for a self-contained appraisal report. The depth of discussion contained in this report is specific to the needs of the client and for the intended use stated below. The appraiser is not responsible for unauthorized use of this report.

Based on the analysis and conclusions presented in the attached report, it is our opinion the market value of the subject property is as follows:

1) The estimated *"as-is"* market value of the fee simple interest in the subject, as of June 10, 2010, is:

**$2,460,000**

**TWO MILLION FOUR HUNDRED SIXTY THOUSAND DOLLARS**

2) The estimated *"prospective"* market value at completion of the 301 subject lots, assuming completion to finished lot condition excluding fees at building permit, and assuming the lots are sold to a single buyer, as of June 10, 2010 (hypothetical value), is:

**$8,125,000**

**EIGHT MILLION ONE HUNDRED TWENTY-FIVE THOUSAND DOLLARS**

D.FIEGL-000737

3)   The estimated *"retrospective"* market value of the subject property, as of December, 2007, is:

*$6,555,000*

**SIX MILLION FIVE HUNDRED FIFTY-FIVE THOUSAND DOLLARS**

The following report contains a study and analysis of data and other material upon which the opinions of value are partially predicated.

Respectfully submitted,

WARREN & ASSOCIATES, INC.

Jeffrey T. Warren, MAI, SRA
California State Cert. No. AG019776

**COMPLAINT/JUDGEMENT/NEWS RELEASE – REIMAR**          **EXHIBIT 20**

D.FIEGL-000739