# EXHIBIT 4



DILLON
GERARDI

DILLON & GERARDI, APC
4660 LA JOLLA VILLAGE DRIVE, SUITE 1040
SAN DIEGO, CALIFORNIA 92122
PHONE 858.587.1800  FAX 858.587.2587

WWW.DILLONGERARDI.COM

May 22, 2012

<u>*Via E-mail and Mail*</u>
*E-mail: gstrutzcpa@aol.com*

Gary Strutz, CPA
Storek, Carlson & Strutz
100 View Street #208
Mountain View, CA 94041

    Re:    <u>George Fiegl</u>

Dear Mr Strutz:

    Our firm represents George Fiegl ("Fiegl") with respect to certain losses he sustained related to Silicon Valley Technology Group, Inc., A Delaware Corporation, ("SVTG DE"), Silicon Valley Technology Group, Inc., a Nevada corporation ("SVTG NV") and Christian "Reimer" Stukenbrock ("Stukenbrock") between 2005-2011.

    We have provided for your review a detailed memorandum, including extensive exhibits to support your review of losses Fiegl sustained. Should you require any additional evidence supporting these facts, please feel free to contact me at your earliest opportunity.

                                  Very truly yours,
                                  DILLON & GERARDI, APC

                                  Timothy P. Dillon

Enclosures: Memorandum dated May 22, 2012 (exhibits sent via CD-ROM only)

D.FIEGL-000740

# Dillon & Gerardi, APC

## MEMORANDUM

TO: George Fiegl               DATE: May 22, 2012

FROM: Timothy P. Dillon

RE: Criminal Fraud Perpetrated on George Fiegl

---

From 2006-2011, George Fiegl ("Fiegl") made a series of cash investments with Christian Reimer Stukenbrock ("Stukenbrock"), an individual who represented he was an experienced venture capitalist that owned and operated Silicon Valley Technology Group, Inc., a Delaware corporation ("SVTG DE") and Silicon Valley Technology Group, Inc., a Nevada corporation ("SVTG NV") (collectively, the "SVTG Entities") which turned out to be sham entities. The frauds and misconduct of Stukenbrock, individually and as the purported representative of the SVTG Entities resulted in a loss of $22,645,030 to Fiegl. Stukenbrock, as the individual orchestrating the fraud, quite literally stole millions of dollars from Fiegl.

Fiegl met Stukenbrock in late 2004. Stukenbrock represented himself as an investor and both Stukenbrock and Fiegl developed a cordial relationship over a series of meetings at Fiegl's office. During the meetings Stukenbrock represented himself as the President and Managing Director of the SVTG Entities, both of which were represented to be venture capital firms engaged in the business of investing in start-up companies. Stukenbrock represented that his experience and contacts gave him access to numerous investment opportunities that appealed to Fiegl. These "target" companies were represented to be looking for investment capital to grow and expand their businesses.

During the period of 2005 through October 2011 Stukenbrock solicited money from Fiegl for investment into 12 separate target companies (each an "Investment Company" and, collectively, the "Investment Companies"). Each of Fiegl's cash investments into the Investment Companies was tied to Stukenbrock's solicitation of Fiegl to invest money directly with either SVTG DE and/or SVTG NV, via a Common Stock Purchase Agreement ("SPA"), to be directly invested into the particular Investment Company. For each solicitation, Stukenbrock claimed he had completed a thorough due diligence investigation. Stukenbrock represented that none of the monies he solicited from Fiegl were to be paid to himself or to other parties, nor were they to be kept by SVTG DE or SVTG NV. The monies invested by Fiegl were to be used solely by the SVTG Entities to directly invest into an Investment Company specified by Fiegl.

In total, Fiegl executed 49 separate SPAs related to his investments, as well as one promissory note for a short term bridge loan. Each of the SPAs was substantially similar, containing many representations that turned out to be blatantly false at the time they were

made. Common misrepresentations made in each of the SPAs[1] include:

- <u>Organization, Good Standing and Qualification</u>. The Company is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware[2], and operates as a foreign corporation under the laws of the state of California, and has all requisite corporate power and authority to own its properties and to carry on its business as now conducted.

- Section 2.2(a) <u>Common Stock</u>. As of the Closing Date, the Company's Certificate of Incorporation authorizes an aggregate of one hundred million (100,000,000) shares of Common Stock ('Common Stock'), of which approximately thirty-five million (35,000,000) shares are issued and outstanding at the time when this option is granted.[3]

- Section 2.7 <u>Compliance with Other Contracts</u>. The Company is not in violation or default of any provision of its Certificate of Incorporation or Bylaws, or of any provision of any instrument or contract to which it is a party or by which it is bound or, to its knowledge, of any provision of any federal, state or local judgment, writ, decree, order, statute, rule or governmental regulation applicable to the Company which default or violation would have a material effect on the Company.

- Section 2.9 <u>Disclosure</u>. …There exists no fact or circumstance which to the knowledge of the Company materially and adversely affects or will materially and adversely affect the Company's business, assets, condition, affairs, operations, properties or prospects, financially or otherwise.

- Section 5.1 <u>Representations and Warranties</u>. The representations and warranties of the Company contained in Section 2 shall be true on and as of the Closing with the same effect as though such representations and warranties had been made on and as of the date of the Closing.

The true facts as they related to the SVTG Entities were:

1. SVTG DE was incorporated in Delaware on July 12, 2000. SVTG DE was authorized to issue up to 100,000,000 shares. However, SVTG DE failed to pay the required Delaware State Taxes and, effective March 1,

---

[1] Each SPA is attached as an exhibit herein. All SPAs derive from the same basic form and make identical representations.

[2] The Nevada SPAs substitute "Nevada" in the place of Delaware, but are otherwise identical.

[3] The Nevada SPAs substitute "eighty million (80,000,000)" in the place of the 100,000,000 shares issued in Delaware. The Nevada SPAs further substitute twenty-eight million (28,000,000) in the place of 35,000,000 outstanding shares for Delaware.

2002, was declared "Void" with an outstanding $540,000 tax bill (See Ex. A);

2. While there was a filing on December 29, 2000 for SVTG DE to conduct business in California as a foreign corporation, SVTG DE failed to file statements of information with the State of California and failed to pay annual taxes such that it was "forfeited" by the State of California as of January 12, 2004;

3. SVTG NV was incorporated in Nevada on March 11, 2005 and was authorized to issue up to 80,000,000 shares. (See Ex. B) SVTG NV is and has been in "Default" status with the State of Nevada (See Ex. C). SVTG NV was not qualified to do business in the State of California until December 30, 2011 (See Ex. D).

In addition to the misrepresentations made in the SPAs, Stukenbrock made additional false statements to Fiegl in connection with Fiegl's various investments of capital, including:

- None of the monies transferred by Fiegl to Stukenbrock would be utilized by Stukenbrock for his own personal use or for other business ventures;

- All funds invested by Fiegl into the SVTG Entities were to be transferred, in their entirety, to the targeted Investment Companies, with the exception of no more than 1-2% that may be utilized for administrative expenses;

- All monies paid by Fiegl to the SVTG Entities would be deposited into the accounts of the particular Investment Companies immediately after received from Fiegl;

- Stukenbrock had extensive experience working with start-up companies in the venture capital industry, had substantial experience evaluating the potential risks associated with angel and venture capital investments, and was qualified to make such investments; and

- Stukenbrock had conducted due diligence on each of the Investment Companies, and recommended each investment to Fiegl based on his due diligence and reports concerning prospective investments.

All of Stukenbrock's representations were false. The true facts were as follows:

→ Stukenbrock misappropriated over 50% of Fiegl's investment money for

his own personal use. Stukenbrock used Fiegl's funds to pay for personal credit cards, pay rent for his own residence, pay for home utility payments, pay for home repairs, pay for prior "shareholders", pay for other Stukenbrock related businesses, pay for personal undocumented loans, pay for automobiles and pay family members;

→ The funds transferred by Fiegl in reliance upon the SPAs were not transferred to the Investment Companies. Less than half of the monies provided by Fiegl to the SVTG Entities were received by the Investment Companies. A majority of the funds were misappropriated by Stukenbrock for his own personal use.

→ Stukenbrock had little to no experience as a venture capitalist and was not qualified to make investment decisions.

→ Stukenbrock did not conduct due diligence on the Investment Companies and did not evaluate whether the investments were sound.

→ Stukenbrock was previously deemed to have violated the Idaho Securities Act and a permanent injunction was issued against him on April 29, 1999 preventing him from offering any securities within that State. Stukenbrock was further permanently enjoined from employing any scheme to defraud investors, making any untrue statement of (or omitting any) material fact related to the sale of securities. (Ex. E);

Because Fiegl's investments into the Investment Companies were intended to be long term investments and Fiegl fully trusted Stukenbrock to be using the funds as represented, Fiegl was unaware of Stukenbrock's fraud for several years. Fiegl became aware that his investments were at risk due to the theft and fraud perpetrated by Stukenbrock once STVG DE defaulted upon the loan obligation set forth in the one bridge loan Fiegl entered into with SVTG DE.

I. **Fiegl's Investments**

In total, Fiegl invested $21,763,030 through SVTG DE and $882,000 through SVTG NV. Fiegl purportedly obtained 31,098,454 shares of the "void" SVTG DE and 7,330,000 shares of "defaulted" SVTG NV via the 49 separate SPAs he entered into. Pursuant to the SPAs, SVTG DE and SVTG NV were to take the funds Fiegl invested and provide the entirety of the funds to the earmarked Investment Company. The twelve (12) Investment Companies were as follows:

        a. Ticket Out Film Partners, LLC ("Ticket Out")
        b. Clean Mobile AG ("Clean Mobile")
        c. Solar Power Partners ("SPP")

      d. Albutec GmBH ("Albutec")
      e. Protech Services, Inc. ("PSI")
      f. Shadow Mountain Corporation ("Shadow Mountain")
      g. AutoNet Mobile, Inc. ("AutoNet")
      h. Info Dream ("Info Dream")
      i. Latino USA ("Latino")
      j. Aeroprise ("Aeroprise")
      k. DOBI Medical ("DOBI")

Each of the investments made in the Investment Companies are described in the tables below.

**The Ticket Out Investments**

Ticket Out was a film project starring Ray Liotta. Stukenbrock represented that he had thoroughly investigated this company and its opportunity for success. In total, Fiegl made 14 separate investments, each via an SPA, for a total investment of $6,890,500. Additionally, Fiegl provided SVTG DE with a $1,200,000 promissory note that was structured as a short term bridge note – the only "loan" Fiegl ever made. The investments Fiegl made in SVTG DE for the purposes of SVTG DE transferring the entirety of the invested funds directly into Ticket Out are as follows:

### TABLE OF TICKET OUT INVESTMENTS

| DATE | AMOUNT | STOCK | COMPANY | INV. CO. | EXHIBIT[4] |
|---|---|---|---|---|---|
| 6/12/2008 | $275,000 | 485,334 | SVTG DE | Ticket Out | F |
| 9/12/2008 | $350,000 | 583,330 | SVTG DE | Ticket Out | G |
| 10/6/2008 | $550,000 | 687,500 | SVTG DE | Ticket Out | H |
| 10/24/2008 | $1,000,000 | 1,250,000 | SVTG DE | Ticket Out | I |
| 11/11/2008 | $650,000 | 812,500 | SVTG DE | Ticket Out | J |
| 11/24/2008 | $650,000 | 750,000 | SVTG DE | Ticket Out | K |
| 12/1/2008 | $600,000 | 750,000 | SVTG DE | Ticket Out | L |
| 12/9/2008 | $750,000 | 937,500 | SVTG DE | Ticket Out | M |
| 12/26/2008 | $350,000 | 937,500 | SVTG DE | Ticket Out | N |
| 1/12/2009 | $400,000 | 500,000 | SVTG DE | Ticket Out | O |
| 9/2/2009 | $400,000 | 500,000 | SVTG DE | Ticket Out | P |
| 10/22/2009 | $400,000 | 500,000 | SVTG DE | Ticket Out | Q |
| 3/8/2010 | $280,000 | 350,000 | SVTG DE | Ticket Out | R |
| 9/29/2010 | $235,500 | 294,375 | SVTG DE | Ticket Out | S |

---

[4] Each Exhibit contains the particular SPA or Promissory note as well as evidence of the payment provided by Fiegl. In some cases, Fiegl made payment via bank check, while others were made via wire transfer.

| DATE | AMOUNT | STOCK | COMPANY | INV. CO. | EXHIBIT[4] |
|---|---|---|---|---|---|
| 1/8/2009 | $1,200,000 (loan via a Promissory Note) | N/A | SVTG DE | Ticket Out | T |
| **TOTAL** | $8,090,500 | 9,338,039 | | | |

**The Clean Mobile Investments**

Stukenbrock first approached Fiegl regarding an investment in Clean Mobile in or around November of 2007. Stukenbrock, Fiegl and two persons from Clean Mobile – Werner Gruber (CEO) and the Bernhard Gutmann (CFO) all attended a meeting in Fiegl's office in November of 2007 during which Clean Mobile and its investment potential was discussed. Clean Mobile built innovative drive system for light electric vehicles and Fiegl was presented with a prospectus regarding Clean Mobile's product. Fiegl was led to believe the product created by Clean Mobile had great potential in Germany. After the meeting in Fiegl's office, the parties all had dinner at Birk's restaurant in Santa Clara. During both the meeting and the dinner, Stukenbrock represented that any funds invested by Fiegl through the SVTG Entities and earmarked for Clean Mobile would be transferred to Clean Mobile only.

The initial SPA was executed with SVTG NV on December 12, 2007. Fiegl entered into nine separate SPAs with SVTG DE documenting investments into Clean Mobile. Fiegl transferred a total of $4,313,400 through the SVTG Entities for the purposes of investing the entirety of the funds into Clean Mobile. The SVTG Entities did not invest the entirety of the funds into Clean Mobile and instead a substantial portion of the monies was used by Stukenbrock for his personal use and/or by the SVTG Entities for matters unrelated to Clean Mobile. The actual amount received by Clean Mobile was approximately $2,500,000. The remaining funds were either retained by the SVTG Entities or were absconded by Stukenbrock.

The investments Fiegl made through the SVTG Entities for the purposes of the SVTG Entities transferring the entirety of the invested funds directly into Clean Mobile are as follows:

**TABLE OF CLEAN MOBILE INVESTMENTS VIA SVTG NV**

| DATE | AMOUNT | STOCK | COMPANY | INV. CO. | EXHIBIT |
|---|---|---|---|---|---|
| 12/12/2007 | $50,000 | 250,000 | SVTG NV | Clean Mobile | U |

**TABLE OF CLEAN MOBILE INVESTMENTS VIA SVTG DE**

| DATE | AMOUNT | STOCK | COMPANY | INV. CO. | EXHIBIT |
|---|---|---|---|---|---|
| 2/25/2008 | $399,500 | 998,750 | SVTG DE | Clean Mobile | V |
| 4/22/2008 | $680,000 | 1,133,333 | SVTG DE | Clean Mobile | W |
| 8/11/2008 | $650,000 | 1,083,333 | SVTG DE | Clean Mobile | X |

| DATE | AMOUNT | STOCK | COMPANY | INV. CO. | EXHIBIT |
|---|---|---|---|---|---|
| 12/1/2008 | $385,000 | 481,250 | SVTG DE | Clean Mobile | Y |
| 9/14/2009 | $385,000 | 481,250 | SVTG DE | Clean Mobile | Z |
| 12/21/2009 | $380,000 | 475,000 | SVTG DE | Clean Mobile | AA |
| 5/18/2010 | $475,000 | 593,750 | SVTG DE | Clean Mobile | BB |
| 12/27/2010 | $369,000 | 453,937 | SVTG DE | Clean Mobile | CC |
| 5/31/2011 | $540,000 | 453,937 | SVTG DE | Clean Mobile | DD |
| TOTAL | $4,263,500 | 6,154,540 | | | |

**The Solar Power Partners Investments**

The investments Fiegl made through SVTG DE for the purpose of SVTG transferring the entirety of the invested funds directly into SPP are as follows:

**TABLE OF SPP INVESTMENTS**

| DATE | AMOUNT | STOCK | COMPANY | INV. CO. | EXHIBIT |
|---|---|---|---|---|---|
| 4/9/2008 | $2,500,000 | 4,166,667 | SVTG DE | SPP | EE |
| 6/25/2008 | $500,000 | 833,333 | SVTG DE | SPP | FF |
| 1/5/2009 | $590,000 | 737,500 | SVTG DE | SPP | GG |
| 2/7/2011 | $150,265 | 187,835 | SVTG DE | SPP | HH |
| TOTAL | $3,740,265 | 5,925,335 | | | |

**The Albutec Investments**

The investments Fiegl made through the SVTG Entities for the purposes of the SVTG Entities transferring the entirety of the invested funds directly into Albutec are as follows:

**TABLE OF ALBUTEC INVESTMENTS VIA SVTG NV**

| DATE | AMOUNT | STOCK | COMPANY | INV. CO. | EXHIBIT |
|---|---|---|---|---|---|
| 11/23/2006 | $125,000 | 625,000 | SVTG NV | Albutec | II |
| 2/9/2007 | $200,000 | 1,000,000 | SVTG NV | Albutec | JJ |
| 4/23/2007 | $127,000 | 635,000 | SVTG NV | Albutec | KK |
| 6/4/2007 | $130,000 | 645,000 | SVTG NV | Albutec | LL |
| 11/15/2007 | $50,000 | 250,000 | SVTG NV | Albutec | MM |
| TOTAL | $632,000 | 3,155,000 | | | |

**TABLE OF ALBUTEC INVESTMENTS VIA SVTG DE**

| DATE | AMOUNT | STOCK | COMPANY | INV. CO. | EXHIBIT |
|---|---|---|---|---|---|
| 3/19/2008 | $440,000 | 1,100,000 | SVTG DE | Albutec | NN |

| DATE | AMOUNT | STOCK | COMPANY | INV. CO. | EXHIBIT |
|---|---|---|---|---|---|
| 10/30/2009 | $230,000 | 383,333 | SVTG DE | Albutec | OO |
| 12/21/2009 | $270,000 | 450,000 | SVTG DE | Albutec | PP |
| 2/2/2010 | $270,000 | 450,000 | SVTG DE | Albutec | QQ |
| 8/31/2010 | $348,765 | 446,875 | SVTG DE | Albutec | RR |
| **TOTAL** | $1,558,765 | 2,830,208 | | | |

### The Protech Investments

The investments Fiegl made in SVTG DE for the purposes of SVTG DE transferring the entirety of the invested funds directly into Protech are as follows:

**TABLE OF PROTECH INVESTMENTS**

| DATE | AMOUNT | STOCK | COMPANY | INV. CO. | EXHIBITS |
|---|---|---|---|---|---|
| 9/12/2008 | $850,000 | 1,416,666 | SVTG DE | Protech | SS |
| 9/25/2008 | $425,000 | 708,333 | SVTG DE | Protech | TT |
| 10/24/2008 | $350,000 | 583,333 | SVTG DE | Protech | UU |
| 10/7/2009 | $375,000 | 625,000 | SVTG DE | Protech | VV |
| 4/30/2010 | $250,000 | 312,500 | SVTG DE | Protech | WW |
| **TOTAL** | $2,250,000 | 3,645,832 | | | |

### The Ready Solar Investments

The investments Fiegl made through SVTG DE for the purposes of SVTG DE transferring the entirety of the invested funds directly into Ready Solar are as follows:

**TABLE OF READY SOLAR INVESTMENTS**

| DATE | AMOUNT | STOCK | COMPANY | INV. CO. | EXHIBITS |
|---|---|---|---|---|---|
| 12/12/2007 | $275,000 | 687,500 | SVTG DE | Ready Solar | XX |
| 4/9/2008 | $475,000 | 791,667 | SVTG DE | Ready Solar | YY |
| 11/11/2008 | $685,000 | 856,500 | SVTG DE | Ready Solar | ZZ |
| **TOTAL** | $1,435,000 | 2,335,667 | | | |

### The Shadow Mountain Investment

The Shadow Mountain project was apparently done in Idaho, where Stukenbrock is specifically enjoined from engaging in the purchase or sale of securities. The investment Fiegl made in SVTG DE for the purposes of SVTG DE transferring the entirety of the invested funds directly into Shadow Mountain, is as follows:

**TABLE OF SHADOW MOUNTAIN INVESTMENT**

| DATE | AMOUNT | STOCK | COMPANY | INV. CO. | EXHIBIT |
|---|---|---|---|---|---|
| 6/12/2008 | $500,000 | 833,333 | SVTG DE | Shadow Mtn. | AAA |

**The AutoNet Mobile ("AutoNet") Investment**

As for this particular investment, Stukenbrock represented that he would reinvest a purported return on a previous $75,000 investment (purported to be $82,500) with an additional $42,500 from Fiegl into AutoNet. In this case, the AutoNet investment was entirely bogus. Fiegl has obtained a declaration from AutoNet's CEO (Sterling Pratz) stating that no Stukenbrock related entity ever invested into AutoNet and specifically rejecting any investment was made in or around August 2007 for $125,000 (See Ex. BBB) Mr. Pratz recounts his one meeting with Stukenbrock which conflicts with how Stukenbrock advised Fiegl that he had met with Mr. Pratz and agreed to invest in the company after completing a through due diligence process. Fiegl's purported investment into AutoNet is reflected below:

**TABLE OF AUTONET INVESTMENT**

| DATE | AMOUNT | STOCK | COMPANY | INV. CO. | EXHIBIT |
|---|---|---|---|---|---|
| 8/29/2007 | $125,000 | 625,000 | SVTG NV | AutoNet | CCC |

**The Info Dream, Latino USA, Aeroprise and DOBI Medical Investments (collectively, the "Info Dream Investment")**

This initial investment made by Fiegl was purportedly returned with 10% interest in or around August 2007. Those funds were ultimately "reinvested" into AutoNet (see above). This transaction specifically shows Stukenbrock's efforts to show Fiegl that his investments were profitable and that Fiegl was better off maintaining his money with Stukenbrock than cashing out. The investment Fiegl made through SVTG NV for the purposes of SVTG NV transferring the entirety of the invested funds directly into Info Dream, is as follows:

**TABLE OF INFO DREAM INVESTMENTS**

| DATE | AMOUNT | STOCK | COMPANY | INV. CO. | EXHIBIT |
|---|---|---|---|---|---|
| 12/15/2005 | $75,000 | 3,300,000 | SVTG NV | Info Dream, LatinoUSA, Aeroprise, DOBI Medical. | DDD |

## II. Facts Related to Stukenbrock's Misappropriation of Funds and Additional Misrepresentations to Fiegl

In addition to the written misrepresentations made to Fiegl via the SPA for each and every investment and Stukenbrock's oral misrepresentations (and omissions) related to his qualifications and his research into each of the Investment Companies, Stukenbrock made several other written and oral misstatements to Fiegl related to the status of Fiegl's investments to prevent or delay Fiegl from learning about Stukenbrock's crimes. These misrepresentations include:

- On or about February 6, 2007, Stukenbrock provided Fiegl a Balance Sheet, Income Statement and General and Administrative Expenses (Ex. EEE). The February 6, 2007 documents showed $5,185,480 in "Assets", with $109,200 in "Revenue", $110,250 in "General and Administrative" expense for a "Gross Loss" of $1,050.

- On or about July 30, 2008, Stukenbrock provided Fiegl with a document entitled "SVTG Investments July 30, 2008" which listed Fiegl's investments in the various Investment Companies (then at $6,885,500) and which also purported to represent Stukenbrock's own personal investments into the same companies ($739,500) (Ex. FFF).

- On or about June 30, 2008, Stukenbrock provided Fiegl an updated Balance Sheet, Income Statement and General and Administrative Expenses (Ex. GGG). The June 30, 2008 documents showed $11,478,806 in "Assets", with $256,474 in "Revenue" and a "Gross Profit" of $104,000, a "Net Profit" of $129,000 based upon "General and Administrative Expenses" of $152,623.

- On or about September 30, 2008, Stukenbrock provided Fiegl an updated Balance Sheet, Income Statement and General and Administrative Expenses (Ex. HHH). The September 30, 2008 documents showed $14,534,364 in "Assets", with $259,711 in "Revenue" and a "Gross Profit" of $59,843, a "Net Profit" of $82,343 based upon "General and Administrative Expenses" of $199,868.

- On or about December 31, 2008, Stukenbrock provided Fiegl an updated Balance Sheet, Income Statement and General and Administrative Expenses (Ex. III). The December 31, 2008 documents showed $20,458,782 in "Assets", with $262,948 in "revenue" and a "Gross Profit" of $9,087, a "Net Profit" of $39,087 based upon "General and Administrative Expenses" of $253,861.

- Stukenbrock represented that Clean Mobile was prepared to do an Initial Public Offering in 2009 that would provide Fiegl with a substantial return on his investment.

The true facts were:

→ The subsequent documentation provided by Stukenbrock was completely bogus and intended to convince Fiegl that his investments were not only safe, but growing. The documentation further was intended to support Fiegl's belief that none of his investments were going to be used for "General and Administrative" expenses because Stukenbrock was able to derive enough revenue to cover all expenses incurred by the SVTG Entities;

→ Neither of the SVTG Entities has ever filed a State of Federal tax return. Stukenbrock now claims that no returns were necessary because the companies never made a profit (directly contradicted by the documentation provided to Fiegl);

→ The bank records received for SVTG DE (no bank account was ever opened for SVTG NV – such that all of Fiegl's purported investments into SVTG NV were deposited into the SVTG DE account) demonstrate wild discrepancies with what the documentation shows. There were enormous sums paid directly to Stukenbrock personally, Stukenbrock's related entities, used for Stukenbrock's personal expenses. Between 2006 – 2007, two SVTG DE bank accounts (with Bridge Bank and Silicon Valley Bank) were closed by the banking institution due to the large number of "nsf" checks. One bank cited a concern that Stukenbrock was engaged in check kiting as a reason to close the account and threatened to report him to the police;

→ Clean Mobile filed for bankruptcy rather than file for an IPO;

### III. Applicable Criminal Statutes

Stukenbrock's actions squarely fall within several California Penal codes and California Corporations Codes with criminal liability relating to fraud arising from the purchase and sale of securities. Each criminal statute is detailed further herein. Pursuant to Rev. Rul. 2009-9 a taxpayer claiming a theft loss must prove that **the loss resulted from a taking of property that was illegal under the law of the jurisdiction in which it occurred and was done with criminal intent.** Rev. Rul. 72-112, 1972-1 C.B. 60. However, a taxpayer need not show a conviction for theft. *Vietzke v. Commissioner*, 37 T.C. 504, 510 (1961), *acq.*, 1962-2 C.B. 6.

#### A. *Cal. Penal Code* §484 - Theft

Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him or her, or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property, or who causes or procures others to report falsely of his or her wealth or mercantile character and by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains possession of money, or property or obtains the labor or service of another, is guilty of theft. *Cal. Penal Code* §484.

### i. *Cal. Penal Code* §487 - Grand Theft

Grand theft is theft (as defined above) committed in any of the following cases:

- When the money, labor, or real or personal property taken is of a value exceeding nine hundred fifty dollars ($950), except as provided in subdivision (b).
- Where the money, labor, or real or personal property is taken by a servant, agent, or employee from his or her principal or employer and aggregates nine hundred fifty dollars ($950) or more in any 12 consecutive month period. *Cal. Penal Code* §487.

### ii. §484 Theft or §487 Grand Theft by Embezzlement (*Cal. Penal Code* §§503, 506 – Embezzlement)

Elements of embezzlement are that: (1) owner entrusted his or her property to the defendant, (2) owner did so because he or she trusted the defendant, (3) defendant fraudulently converted that property for his or her own benefit, and (4) when the defendant converted the property, he or she intended to deprive the owner of its use. *People v. Fenderson*, 188 Cal.App.4th 625 (2010), review denied.

Where one honestly receives possession of goods upon a trust and thereafter fraudulently converts them to his own use, he is guilty of "embezzlement"; but, where possession has been obtained through trickery or deceit with intent at time of receipt of goods to convert them, and owner parts merely with possession and not with title, the offense of "larceny" has been committed. *People v. Brennan*, 41 Cal.App.2d 143 (1940).

### iii. *Cal. Penal Code* §484 - Larceny by Trick

The crime of theft by trick or device requires: (1) obtaining possession of property of another by some trick or device, (2) intent by the wrongdoer to convert it to his own use and to permanently deprive the owner thereof, and (3) transfer of possession but not title to the wrongdoer. *People v. Frederick*, 142 Cal.App.4th 400 (2006), review denied, habeas corpus denied 2011 WL 282335.

### iv. §484 Theft or §487 Grand Theft by False Pretenses (*Cal. Penal Code* §532 - False Pretenses)

Theft by false pretenses, under California law, has three elements: (1) a false pretense or representation, (2) the intent to defraud the owner of his or her property, and (3) the false pretense or representation materially influenced the owner to part with the property. *Carrillo-Jaime v. Holder*, 572 F.3d 747 (9th Cir. 2009).

### v. §484 Theft or §487 Grand Theft by False Pretenses *(Cal. Penal Code* §532a - False Financial Statements)

Any person who shall knowingly make or cause to be made, either directly or indirectly or through any agency whatsoever, any false statement in writing, with intent that it shall be relied upon, respecting the financial condition, or means or ability to pay, of himself or herself, or any other person, firm or corporation, in whom he or she is interested, or for whom he or she is acting, for the purpose of procuring in any form whatsoever, either the delivery of personal property, the payment of cash, the making of a loan or credit, the extension of a credit, the execution of a contract of guaranty or suretyship, the discount of an account receivable, or the making, acceptance, discount, sale or endorsement of a bill of exchange, or promissory note, for the benefit of either himself or herself or of that person, firm or corporation <u>shall be guilty of a public offense</u>. *Cal. Penal Code* §532a.

This also applies to a person who knows such statement was made or, if a person represents the same statement in writing on a later day, knowing the statement is false when repeated. *Cal. Penal Code* §532a. "Statement in writing * * * respecting * * * financial condition" that can serve as basis for prosecution for making false financial statement is not limited to statutory definition of "financial statement" contained in Financial Code; rather, prosecution may be based on any false statement in writing respecting financial condition or means or ability to pay. *People v. Vincent*, 19 Cal.App.4th 696 (App. 2 Dist. 1993), review denied.

### B.  *Cal. Corp. Code* §2251 – Knowingly Or Fraudulently Making An Unauthorized Or Unlawful Issue Of Shares

Any promoter, director or officer of a corporation who knowingly and willfully issues or consents to the issuance of certificates for certificated securities, or initial transaction statements or written statements for uncertificated securities, in violation of this division with intent to defraud present or future shareholders, subscribers, purchasers of shares or creditors <u>is guilty of a misdemeanor</u> punishable by a fine of not more than one thousand dollars ($1,000) or imprisonment for not more than one year or both.

This statute may be applied to our facts where shares of stock in SVTG DE were purportedly issued to Fiegl despite the fact that SVTG DE was not a valid entity at the time of "issuance."

### C.  *Cal. Corp. Code* §2254 – Knowing Publication of False Statement

Every director, officer or agent of any corporation, domestic or foreign, is guilty of a felony (a) who knowingly concurs in making, publishing or posting either generally or privately to the shareholders or other persons (1) any written report, exhibit, statement of its affairs or pecuniary condition or notice containing any material statement which is false, or (2) any untrue or willfully or fraudulently exaggerated report, prospectus, account, statement of operations, values, business, profits, expenditures or prospects, or (3) any other paper or document intended to produce or give, or having a tendency to produce or give, the shares of stock in such corporation a greater value or a less apparent or market value than they really possess, or (b) who refuses to make any book entry or post any notice required by law in the manner required by law.

### D. *Cal. Corp. Code* §2259 – Knowingly Transacts Unauthorized Business

Any person who transacts intrastate business on behalf of a foreign corporation which is not authorized to transact such business in this state, knowing that it is not so authorized, is guilty of a misdemeanor punishable by fine of not less than fifty dollars ($50) nor more than six hundred dollars ($600).

### E. *Cal. Corp. Code* §25540 – Violation of Securities Law

(a) Except as provided for in subdivision (b), any person who willfully violates any provision of this division, or who willfully violates any rule or order under this division, shall upon conviction be fined not more than one million dollars ($1,000,000), or imprisoned pursuant to subdivision (h) of Section 1170 of the Penal Code, or in a county jail for not more than one year, or be punished by both that fine and imprisonment; but no person may be imprisoned for the violation of any rule or order if he or she proves that he or she had no knowledge of the rule or order.

(b) Any person who willfully violates Section 25400, 25401, or 25402, or who willfully violates any rule or order under this division adopted pursuant to those provisions, shall upon conviction be fined not more than ten million dollars ($10,000,000), or imprisoned pursuant to subdivision (h) of Section 1170 of the Penal Code for two, three, or five years, or be punished by both that fine and imprisonment.

#### i. *Cal. Corp. Code* §25403 (in conjunction with *Cal. Corp. Code* §25540) – Aiding / Inducing Violations

(a) Every person who with knowledge directly or indirectly controls and induces any person to violate any provision of this division or any rule or order thereunder shall be deemed to be in violation of that provision, rule, or order to the same extent as the controlled and induced person.

(b) Any person that knowingly provides substantial assistance to another person in violation of any provision of this division or any rule or order thereunder shall be deemed to be in violation of that provision, rule, or

order to the same extent as the person to whom the assistance was provided.

(c) It shall be unlawful for any person directly or indirectly to do any act or thing which would be unlawful for that person to do under any provision of this division or any rule or order thereunder through or by any other person.

### ii. *Cal. Corp. Code* §25401 (in conjunction with *Cal. Corp. Code* §25540) – Sale of Security based on False Statement

It is unlawful for any person to offer or sell a security in this state or buy or offer to buy a security in this state by means of any written or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading.

### F. *Cal. Corp. Code* §25541 – Using a Scheme to Defraud in connection with Sale of Security

Any person who willfully employs, directly or indirectly, any device, scheme, or artifice to defraud in connection with the offer, purchase, or sale of any security or willfully engages, directly or indirectly, in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person in connection with the offer, purchase, or sale of any security <u>shall upon conviction be fined not more than ten million dollars ($10,000,000), or imprisoned pursuant to subdivision (h) of Section 1170 of the Penal Code for two, three, or five years, or be punished by both that fine and imprisonment.</u>

### G. *People v. Smith*, 179 Cal. App. 4th 986 (2009)

· Defendant was convicted in the Superior Court, Los Angeles County, No. BA318284, of eight counts of grand theft, eight counts of selling unqualified securities, eight counts of using false statements to sell securities, and one count of using a scheme to defraud. Defendant appealed. The Appellate Court affirmed the conviction. In discussing the sufficiency of evidence of fraudulent intent with regard to the grand theft and use of false statements in the sale of securities charges, the Court stated the agreements between the Defendant and alleged victims established that Defendant promised to pay fantastic returns not just to the eight victims who testified, but to numerous others. The sheer number of agreements entered into by Defendant supported the prosecution's theory that Defendant was generating money to pay existing investors only by soliciting new ones, and not—as appellant claimed—through any legitimate real estate development. *People v. Smith*, 179 Cal. App. 4th 986, 1004 (2009). The Court went on to note that if the evidence had been limited to Defendant's interaction with the eight witnesses (a handful of agreements), the defense's argument that Defendant intended in good faith to compensate investors from the anticipated profits on development of the real property investment would have had more force. *Id.* at 1004.

Under our facts, the only defense that could get in the way of many of these charges is the fraudulent intent element. With regard to the Corporations Code, the Defendant must be aware of the rule. Like Smith suggested, SVTG may argue that it intended to repay Fiegl all along, and the investments had the potential to be very lucrative. Such an argument, if found persuasive, may be sufficient to overcome Fiegl's burden to show fraudulent intent with regard to the theft crimes and certain corporations code violations.

However, under our facts, Stukenbrock stole and misappropriated over 50% of the monies transferred by Fiegl for his own personal use and for investment in his own business ventures. Stukenbrock depleted several millions of dollars of corporate monies and used corporate funds to pay for personal credit cards, pay rent for his own residence, pay for home utility payments, pay for home repairs, pay for third party businesses owned or controlled by Stukenbrock, pay for personal undocumented loans, pay for automobiles and pay family members.

Moreover, the funds transferred by Fiegl via the Purchase Agreements were not transferred to the Investment Companies. Less than half of the monies provided by Fiegl to the SVTG Entities were received by the Investment Companies. A majority of the funds were misappropriated by Stukenbrock for his own personal use.

These facts strongly support a claim of fraud and theft by Stukenbrock, individually and on behalf of the SVTG Entities, against Fiegl.

### H. Effect of Void/Forfeited Corporations

Since March 1, 2002, SVTG DE has been a void corporation by declaration of the Secretary of State of Delaware for SVTG DE's failure to pay its franchise tax fees and make necessary filings. A corporation, whose charter is void and powers inoperative because of failure to pay franchise taxes for two years, is "dissolved", no longer enjoys the benefits of corporate existence and no individual may continue to purport to act on its behalf. *Wuerfel v. F.H. Smith Co.*, 25 Del. Ch. 82, 84 (1940). Continuing to act on behalf of a void corporation may result in criminal penalties. 8 Del.C. §513. After the charter of a corporation has been repealed by the legislature, "its life is at an end. Whatever force the law may give to transactions into which the corporation entered and which were authorized by the charter while in force, it can originate no new transactions dependent on the power conferred by the charter." *Greenwood v. Union Freight R. Co.*, 105 U.S. 13, 26 L. ED. 961 (1881). "Upon forfeiture of corporate charter for non-payment of annual franchise taxes for two consecutive years, charter became void, and all corporation's powers inoperative. *Frederic G. Krapf & Son, Inc. v. Gorson*, 243 A.2d 713 (1968).

8 Del. C. §513 specifically provides, that "Whoever exercises or attempts to exercise any powers under the certificate of incorporation of any corporation which has been proclaimed by the Governor, after the issuance of the proclamation, shall be fined not more than $1,000 or imprisoned not more than 1 year, or both."

Similarly, in California, a void or forfeited corporation has no rights to conduct business, enter into binding agreements or purport to operate as Stukenbrock operated the SVTG Entities during the time of Fiegl's investments.

### IV. Fiegl Becomes Aware of Misrepresentations

Due to the long term nature of Fiegl's 49 investments made via the SPAs discussed above. However, with respect to the Promissory Note entered into in January 2009 for a short term bridge loan for the Ticket Out project, when that note initially became due in February 2009, Stukenbrock only returned $289,000 of the $1.2 million based upon claims that the remainder would be paid back in a few weeks. Over the next several months, Stukenbrock continued to make representations to Fiegl that the Ticket Out film project was being shopped to a distributor and that funds to repay Fiegl's promissory note were forthcoming.

As the repeated promises and representations concerning the remaining funds continued into 2010, Fiegl became suspicious that the SVTG Entities were not as solvent as represented by Stukenbrock and were inconsistent with the financial information Stukenbrock had provided by Fiegl. Due to the fact that the SVTG Entities had no funds in its bank account due to the fact that Stukenbrock immediately depleted any funds that came in to pay for his personal expenses, there was no reasonable prospect Fiegl would be repaid the amounts of his investment (or his promissory note).

### V. Fiegl's Losses Related to the SVTG Entities and Stukenbrock

Other than the return of $289,000 on the single promissory note, Fiegl is unlikely to recover any of the amounts invested into the SVTG Entities, a loss of $20,905,030. The amount outstanding on the promissory note is $911,000. The total loss is $21,816,030, of which no recovery is likely.